Ouida Sue **PARKER**, Plaintiff–Appellant,

v.

**METROPOLITAN LIFE INSURANCE COMPANY, Schering–Plough Corporation, and Schering–Plough Health Care Products, Inc., Defendants–Appellees.**

No. 95–5269.

United States Court of Appeals, Sixth Circuit.

Argued April 23, 1997.

Decided Aug. 1, 1997.

Kaye G. Burson (argued and briefed), Rutledge & Rutledge, Memphis, TN, for Appellant.

Roger K. Rutledge (briefed), Rutledge & Rutledge, Memphis, Tennessee, for Appellant.

Ronald S. Rauchberg (argued and briefed), Proskauer, Rose, Goetz & Mendelsohn, New York City, and Frederick J. Lewis (argued and briefed), McKnight, Hudson, Lewis & Henderson, Memphis, TN, Allan M. Marcus (briefed), Metropolitan Life Insurance Company, New York City, and Nicole Marie Walthour (briefed), McKnight, Hudson, Lewis & Henderson, Memphis, TN, for Appellee.

Gregory B. Stites (briefed), National Association of Insurance Commissioners, Kansas City, MO, Ronald S. Cooper (briefed), Steptoe & Johnson, Washington, DC, Patrick W. Shea (briefed), Paul, Hastings, Janofsky & Walker, Stamford, CT, Jaime R. Ebenstein (briefed), J.R. Ebenstein Consultants, Valparaiso, IN, Glenn Felton (briefed), Chattanooga, TN, Susan G. Riseman (briefed), Worcester, MA, Ann E. Reesman (briefed), McGuiness & Williams, Washington, DC, Pa-

**1008**

tricia A. Dunn (briefed), Jones, Day, Reavis & Pogue, Washington, DC, and David M. Selcer (briefed), Baker & Hostetler, Columbus, OH, for Amici Curiae.

Before: MARTIN, Chief Judge, MERRITT, KENNEDY, NELSON, RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER, BATCHELDER, DAUGHTREY, MOORE, and COLE, Circuit Judges.

KENNEDY, J., delivered the opinion of the court, in which NELSON, RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER, and BATCHELDER, JJ., joined. MARTIN, C.J. (pp. 1019–20) and MERRITT, J. (pp. 1020–21), delivered separate dissenting opinions, in which MOORE, J., joined, with Chief Judge MARTIN and Judges DAUGHTREY and COLE also joining in Judge MERRITT'S dissent.

## OPINION

KENNEDY, Circuit Judge.

 Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12182–12189 ("ADA"), prohibits discrimination on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation. In the instant case, we are asked to determine whether Title III of the ADA prohibits an employer from providing to its employees a long-term disability plan issued by an insurance company which contains longer benefits for employees who become disabled due to a physical illness than for those who become disabled due to a mental illness. For the reasons set forth below, we conclude that such a distinction is not prohibited.

## I.

Plaintiff, Ouida Sue Parker, was employed by Schering–Plough Health Care Products, Inc. ("Schering–Plough") from April 20, 1981 through October 29, 1990. During her employment, Parker participated in a long-term disability plan offered by Schering–Plough to its employees; the plan was issued by Metropolitan Life Insurance Co. ("MetLife"). Un-

der the plan, an individual who is deemed to be totally disabled due to a mental or nervous disorder may receive benefits for up to twenty-four months, unless at the termination of the twenty-four month period, the individual was hospitalized or receiving inpatient care for the disorder. For physical disorders, however, the plan provides for benefits until the individual reaches sixty-five years of age.

On October 29, 1990, Parker became disabled due to severe depression. On April 29, 1991, Parker began to receive benefit payments under the plan. Because Parker suffered from a mental disorder, Schering–Plough terminated her payments twenty-four months later, on April 28, 1993, pursuant to the terms of the plan. Following Schering–Plough's denial of two administrative appeals filed by Parker, plaintiff filed this action alleging violations of the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213, and the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 ("ERISA"). The District Court granted the defendants' motion for summary judgment. The District Court first found that Parker did not have standing to sue under Title I of the ADA, 42 U.S.C. §§ 12111–12117, because only a "qualified individual with a disability" may obtain relief under Title I and Parker was not a "qualified individual with a disability" when her benefits were terminated because her disorder prevented her from performing the essential functions of her employment position. The District Court also dismissed Parker's claim against the defendants under Title III of the ADA, 42 U.S.C. §§ 12165–12189. MetLife was not a proper defendant under Title III, the court concluded, because Title III only covers discrimination in the physical access to goods and services, not discrimination in the terms of insurance policies. The Title III claim against Schering–Plough, Parker's employer, was dismissed because Title I, not Title III, governs discrimination in employment practices. Because Parker was not a qualified individual under Title I, a suit against her employer could not be maintained under the ADA. Lastly, the District Court granted summary judgment in favor of the defendants on Par-

ker's ERISA claim because the classification of her disorder as "nervous/mental" was not arbitrary or capricious.

On appeal from the District Court's order, a panel of this Court affirmed the District Court's judgment as to Parker's ERISA claim[1] and Title I claim under the ADA.[2] The panel, however, reversed the District Court's judgment as to plaintiff's claim under Title III of the ADA. Disagreeing with the District Court, the panel concluded that Title III "prohibits discrimination in the contents of the goods and services offered at places of public accommodation, rather than just discrimination in terms of physical access to places of public accommodation." *Parker v. Metropolitan Life Ins. Co.*, 99 F.3d 181, 187 (6th Cir.1996). Accordingly, the panel found that Title III covers insurance products because "insurance products are 'goods' or 'services' provided by a 'person' who owns a 'public accommodation.' " *Id.* at 188.

Because the panel concluded that the contents of insurance products are governed by Title III, it then turned to whether Title IV of the ADA, 42 U.S.C. § 12201(c), commonly referred to as the "safe harbor provision," precluded application of Title III to insurance products. The panel concluded that the safe harbor provision was ambiguous on its face as to whether it intended to exempt insurance products from ADA coverage. It, therefore, looked to legislative history for guidance. The panel concluded that the legislative history indicated that "insurance practices are protected by the 'safe harbor' provision, but only to the extent that they are consistent with 'sound actuarial principles,' 'actual reasonably anticipated experience,' and 'bona fide risk classification.' " *Parker*, 99 F.3d at 191. Responding to the defendants' argument that an insurance plan violates the ADA only if it is a "subterfuge" under § 12201(c), the panel declined to adopt the Supreme Court's definition of subterfuge pronounced in *Ohio Public Employees Retirement System v. Betts*, 492 U.S. 158, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989). In *Betts*, the Court defined the term subterfuge in the

Age Discrimination in Employment Act ("ADEA") as an intent to discriminate. *See Betts*, 492 U.S. at 181, 109 S.Ct. at 2868–69. Declining to follow the ADEA definition of subterfuge, the panel held that an insurance plan is a subterfuge under the ADA if it is "based on speculation, and not on sound actuarial principles, actual or reasonably anticipated experience, or bona fide risk classification." *Parker*, 99 F.3d at 191–92.

Finally, in response to Schering–Plough's contention that Title I, not Title III, governs employment practices, the panel held that "based on our affirmance of Plaintiff's Title I claim, it is not clear whether Schering remains a proper defendant to the remaining claim [Title III] of this suit." *Parker*, 99 F.3d at 194. The panel did not resolve this question of law; rather, it instructed the lower court that the issue was ripe for its determination on remand. *Id.*

Following the panel's decision, the defendants sought rehearing *en banc* on the panel's disposition of Parker's Title III claim. We granted their petition and vacated our prior judgment. *See Parker v. Metropolitan Life Ins. Co.*, 107 F.3d 359 (6th Cir.1997). Accordingly, the case is again before us for our determination. Upon review, we conclude that the judgment of the District Court will be **AFFIRMED**.

**II.**

Our standard of review of a grant of summary judgment is *de novo;* we use the same test as used by the district court. *See Brooks v. American Broadcasting Cos.*, 932 F.2d 495, 500 (6th Cir.1991). Summary judgment is proper if the evidence " 'show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to [a] judgment as a matter of law.' " *See* Fed.R.Civ.P. 56(c); *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir.1988)(quoting Fed.R.Civ.P. 56(c)).

---

1. Neither party sought rehearing on the disposition of Parker's ERISA claim.

2. Although Parker discusses her Title I claim in her briefing to the *en banc* court, Parker did not seek rehearing on the disposition of her Title I claim.

## III.

### A. Title III: Places of Public Accommodation

█ To determine whether a benefit plan provided by an employer falls within the prohibitions of Title III, we must begin by examining the statutory text. *See United States v. Gonzales,* —— U.S. ——, ——, 117 S.Ct. 1032, 1034, 137 L.Ed.2d 132 (1997); *Kurinsky v. United States,* 33 F.3d 594, 596 (6th Cir.1994)(citing *United States v. Johnson,* 855 F.2d 299 (6th Cir.1988)), *cert. denied,* 514 U.S. 1082, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995). The ADA generally prohibits discrimination against the disabled by employers, public entities, and by operators of public accommodations. *See* 42 U.S.C. §§ 12101–12213. Title III of the ADA specifically addresses discrimination by owners, lessors, and operators of public accommodations. It provides as follows:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).

Section 12181 sets forth the following list of private entities that are considered public accommodations for purposes of Title III:

(A) an inn, hotel, motel, or other place of lodging . . .

(B) a restaurant, bar, or other establishment serving food or drink;

(C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

(D) an auditorium, convention center, lecture hall, or other place of public gathering;

(E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

(F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharma-cy, *insurance office,* professional office of a health care provider, hospital, or other service establishment;

(G) a terminal, depot, or other station used for specified public transportation;

(H) a museum, library, gallery, or other place of public display or collection;

(I) a park, zoo, amusement park, or other place of recreation;

(J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

(K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

(L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

42 U.S.C. § 12181(7)(emphasis added).

Title III specifically prohibits, *inter alia,* the provision of unequal or separate benefits by a place of public accommodation. *See* 42 U.S.C. §§ 12182(b)(1)(A)(i)-(iii). For example, 42 U.S.C. § 12182(b)(1)(A)(ii) provides that it is "discriminatory to afford an individual or class of individuals, on the basis of a disability . . . with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals . . ." 42 U.S.C. § 12182(b)(1)(a)(ii). To the extent that subsections (i), (ii), and (iii) do not explicitly state that they apply only to public accommodations, subsection (iv) expressly provides that ". . . the term 'individual or class of individuals' refers to the clients or customers of the covered public accommodation . . ." 42 U.S.C. § 12182(b)(1)(a)(iv).

While we agree that an insurance office is a public accommodation as expressly set forth in § 12181(7), plaintiff did not seek the goods and services of an insurance office. Rather, Parker accessed a benefit plan provided by her private employer and issued by MetLife. A benefit plan offered by an employer is not a good offered by a place of public accommodation. As is evident by § 12187(7), a public accommodation is a physical place and this Court has previously

so held. In *Stoutenborough v. National Football League, Inc.*, 59 F.3d 580 (6th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 674, 133 L.Ed.2d 523 (1995), Thomas Stoutenborough and an association of hearing impaired persons filed suit against the National Football League ("NFL") and several television stations under Title III of the ADA alleging that the NFL's "blackout rule" discriminates against them because hearing impaired individuals have no other means of accessing football games when live telecasts are prohibited. They cannot, for example, listen to the broadcast on the radio. *Id.* at 582. To place the blackout rule within the purview of Title III, the plaintiffs argued that they were denied substantially equal access to live television transmissions of football games which is a service of a public accommodation. *Id.* This Court rejected the plaintiffs' contention holding that the defendants did not fall within any of the twelve categories enumerated in § 12181(7). *Id.* at 583. Furthermore, we held that "the prohibitions of Title III are restricted to 'places' of public accommodation . . ." *Id.* A "place," as defined by the applicable regulations, is " 'a facility, operated by a private entity, whose operations affect commerce and fall within at least one of the' twelve 'public accommodation' categories." *Id.* (quoting 28 C.F.R. § 36.104). " 'Facility,' in turn, is defined as 'all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located.' " *Id.* Although the court acknowledged that the football games were played in a place of accommodation and that the television broadcasts were a service provided by the defendants, the court concluded that the broadcasts "do[ ] not involve a 'place of public accommodation.' " *Id.* Accordingly, we held that the service offered by the defendants did not involve a place of public accommodation. *Id.* Quoting the dis-

trict court's opinion, we explained that " '[i]t is all of the services which the public accommodation offers, not all services which the lessor of the public accommodation offers which fall within the scope of Title III.' " *Id.* Finally, the court noted that "plaintiffs' argument that the prohibitions of Title III are not solely limited to 'places' of public accommodation contravenes the plain language of the statute." *Id.; see also McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 463 (6th Cir.1997)(Michigan High School Athletic Association is not a public accommodation); *Sandison v. Michigan High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1036 (6th Cir.1995)(same).

Similarly, the good that plaintiff seeks is not offered by a place of public accommodation. The public cannot enter the office of MetLife or Schering–Plough and obtain the long-term disability policy that plaintiff obtained. Parker did not access her policy from MetLife's insurance office. Rather, she obtained her benefits through her employer. There is, thus, no nexus between the disparity in benefits and the services which MetLife offers to the public from its insurance office.[3] *See, e.g., Pappas v. Bethesda Hosp. Ass'n*, 861 F.Supp. 616 (S.D.Ohio 1994)(no nexus existed between alleged discrimination and any public accommodation under Title III where a nurse was denied health benefits provided by her employer, a hospital, and administered by a benefit services agency).

The Department of Justice's explanation of whether wholesale establishments are places of public accommodation supports our conclusion that MetLife's offering of a disability plan to Schering–Plough is not a service offered by a place of public accommodation. As the Department explains:

... The Department intends for wholesale establishments to be covered ... as places of public accommodation except in cases where they sell exclusively to other busi-

**3.** Judge Merritt's dissent suggests that our opinion concludes that Parker's disability plan obtained through her employer is not covered by Title III because she physically did not access her policy from MetLife's insurance office. We have not so held. The policy Parker obtained is not covered by Title III because Title III covers

only physical places. We have expressed no opinion as to whether a plaintiff must physically enter a public accommodation to bring suit under Title III as opposed to merely accessing, by some other means, a service or good provided by a public accommodation.

nesses and not to individuals ... [However-er], [i]f th[e wholesale company] operates a road side stand where its crops are sold to the public, the road side stand would be a sales establishment covered by the ADA ...

Of course, a company that operates a place of public accommodation is subject to this part only in the operation of that place of public accommodation. In the example given above, the wholesale produce company that operates a road side stand would be a public accommodation only for the purposes of the operation of that stand. The company would be prohibited from discriminating on the basis of disability in the operation of the road side stand, and it would be required to remove barriers to physical access ...

28 C.F.R. pt. 36, app. B at 604 (1996). Thus, the offering of disability policies on a discounted rate solely to a business is not a service or good offered by a place of public accommodation.

**4.** We, thus, disagree with *Doukas v. Metropolitan Life Ins. Co.*, 950 F.Supp. 422, 426 (D.N.H. 1996)("The broad wording and diversity of these 'specific prohibitions,' [in § 12182(b)(2)(A)] are a strong indication that Title III was intended to extend beyond mere access or availability of a good or service.") and *Kotev v. First Colony Life Ins. Co.*, 927 F.Supp. 1316, 1321 (C.D.Cal.1996)(following the First Circuit's decision in *Carparts Distribution Ctr. Inc. v. Automotive Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 19 (1st Cir.1994), the court concluded that Title III is not limited to the mere denial of physical access to places of public accommodation).

**5.** The Department of Justice has in other writings interpreted Title III to include regulation of the substantive terms of insurance contracts. *See* DOJ Technical Assistance Manual, § III–3.11000, *reprinted in* Americans with Disabilities Act Manual (BNA) at 90:0917. That provision of the technical assistance manual provides:

> Insurance offices are places of public accommodation and, as such, may not discriminate on the basis of disability in the sale of insurance contracts or in the terms or conditions of the insurance contracts they offer. Because of the nature of the insurance business, however, consideration of disability in the sale of insurance contracts does not always constitute "discrimination." An insurer or other public accommodation may underwrite, classify, or administer risks that are based on or not in-

Furthermore, Title III does not govern the content of a long-term disability policy offered by an employer. The applicable regulations clearly set forth that Title III regulates the availability of the goods and services the place of public accommodation offers as opposed to the contents of goods and services offered by the public accommodation.[4] According to the Department of Justice:

> .The purpose of the ADA's public accommodations requirements is to ensure accessibility to the goods offered by a public accommodation, not to alter the nature or mix of goods that the public accommodation has typically provided. In other words, a bookstore, for example, must make its facilities and sales operations accessible to individuals with disabilities, but is not required to stock Brailled or large print books. Similarly, a video store must make its facilities and rental operations accessible, but is not required to stock closed-captioned video tapes.[5]

28 C.F.R. pt. 36, app. B at 630; *see also* 28 C.F.R. § 36.212 (1996).[6] While Title IV of

consistent with State law, provided that such practices are not used to evade the purposes of the ADA.

Thus, a public accommodation may offer a plan that limits certain kinds of coverage based on classification of risk, but may not refuse to insure, or refuse to continue to insure, or limit the amount, extent, or kind of coverage available to an individual, or charge a different rate for the same coverage solely because of a physical or mental impairment, except where the refusal, limitation, or rate differential is based on sound actuarial principles or is related to actual or reasonably anticipated experience. The ADA, therefore, does not prohibit use of legitimate actuarial considerations to justify differential treatment of individuals with disabilities in insurance.

As this interpretation is inconsistent with its regulations and the statutory text of Title IV, we decline to adopt it. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *Municipal Resale Serv. Customers v. Federal Energy Regulatory Comm'n*, 43 F.3d 1046, 1053 (6th Cir.1995).

**6.** 28 C.F.R. § 36.212 provides, in part:

> (a) This part shall not be construed to prohibit or restrict—
>
> (1) An insurer ... from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law; or

the ADA, 42 U.S.C. § 12201(c), may address the contents of insurance policies provided by a public accommodation,[7] Title IV does not address the contents of a long-term disability plan offered by an employer because it is not a place of public accommodation.[8] We, therefore, disagree with the First Circuit's decision in *Carparts Distribution Center, Inc. v. Automotive Wholesaler's Association of New England, Inc.*, 37 F.3d 12 (1st Cir. 1994). In *Carparts*, the health benefit plan offered by the employer contained a $25,000 cap on benefits for AIDS related illnesses while the plan provided $1,000,000 in coverage for any other illness. *Id.* at 14. The executors of the estate of an employee, who suffered from AIDS, brought suit against the provider of the self-funded medical reimbursement plan under the ADA alleging that the lifetime cap on health benefits for individuals with AIDS was discriminatory. *Id.* The court rejected the district court's conclusion that defendants were not liable under Title III because they were not places of public

accommodation. *Id.* at 19. In rejecting the district court's construction, the court cited to the list of private entities considered public accommodations in § 12181(7) of Title III. The court particularly noted that the list includes a " 'travel service,' a 'shoe repair service,' an 'office of an accountant, or lawyer,' an 'insurance office,' a 'professional office of a healthcare provider,' and 'other service establishment[s]' ". *Id.* (citing 42 U.S.C. § 12181(7)(F)). The plain meaning of those terms, the court concluded, "does not require 'public accommodations' to have physical structures for persons to enter." *Id.* The court further noted that "[b]y including 'travel service' among the list of services considered 'public accommodations,' Congress clearly contemplated that 'service establishments' include providers of services which do not require a person to physically enter an actual physical structure." *Id.* The court, therefore, concluded that a defendant who provides medical benefit plans could be [9] con-

(2) A person or organization covered by this part from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that are based on underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law; or

(3) A person or organization covered by this part from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that is not subject to State laws that regulate insurance.

(b) Paragraphs (a)(1),(2), and (3) of this section shall not be used as a subterfuge to evade the purposes of the Act or this part.

7. Title IV and its accompanying regulations only require that an insurance policy offered by a place of public accommodation be consistent with state law and not a subterfuge to evade the purposes of the ADA to fall within the safe harbor provision. However, it is the opinion of both the Department of Justice and the Equal Employment Opportunity Commission that disparities in insurance policies must be supported by sound actuarial principles. *Compare* 42 U.S.C. § 12201(c) *and* 28 C.F.R. § 36.212 *with* DOJ Technical Assistance Manual, § III–3.11000, *reprinted in* Americans with Disabilities Act Manual (BNA) at 90:0917 *and* EEOC: Interim Policy Guidance on ADA and Health Insurance, June 8, 1993, *reprinted in* Americans With Disabilities Act Manual (BNA) at 70:1052–55.

The discrepancy between the statute, the regulations, and the agency interpretations is due to Congress' failure to define the term "subterfuge" in Title IV of the ADA. The EEOC and the Justice

Department, in certain writings, have expressed the view that, in order for a policy not to be a subterfuge, it must be based on sound actuarial principles. This definition is inconsistent with the Supreme Court's definition of the term subterfuge contained in the Age Discrimination in Employment Act. *See Ohio Public Employees Retirement Sys. v. Betts*, 492 U.S. 158, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989). In *Betts*, the Court defined subterfuge as a specific intent to discriminate. *Id.* at 181.

We leave the resolution of the proper definition of subterfuge in Title IV for another day because we conclude that a long-term disability plan provided by an employer is not covered by Title III; the safe harbor provision is, therefore, not implicated.

8. Judge Merritt's dissent contends that our conclusion flies in the face of Title IV of the ADA. In so contending, the dissent assumes that, by reaching our conclusion, we have held that insurance policies obtained through an employer are in no instance covered by the ADA. We have, rather, held only that a long-term disability plan obtained through an employer is not a public accommodation under Title III of the ADA. Because we do not have the issue before us, we express no opinion as to whether Title I covers employer-provided insurance policies thereby triggering application of Title IV.

9. The court did not hold that an organization providing medical benefit plans is a public accommodation; rather, the court remanded the case to the district court to "allow plaintiffs the

**1014**

sidered a public accommodation under Title III. *Id.*

 In arriving at this conclusion, the First Circuit disregarded the statutory canon of construction, *noscitur a sociis. See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 701–03, 115 S.Ct. 2407, 2415, 132 L.Ed.2d 597 (1995). The doctrine of *noscitur a sociis* instructs that "a ... term is interpreted within the context of the accompanying words 'to avoid the giving of unintended breadth to the Acts of Congress.'" *Kurinsky v. United States,* 33 F.3d 594, 597 (6th Cir.1994)(quoting *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961)), *cert. denied,* 514 U.S. 1082, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995); *see also Owen of Georgia, Inc. v. Shelby County,* 648 F.2d 1084, 1092 (6th Cir.1981). Black's Law Dictionary defines the term as:

> It is known from its associates. The meaning of a word is or may be known for the accompanying words. Under the doctrine of "noscitur a sociis", the meaning of questionable or doubtful words or phrases in a statute may be ascertained by reference to the meaning of other words or phrases associated with it.

BLACK'S LAW DICTIONARY 1060 (6th ed.1990).

The clear connotation of the words in § 12181(7) is that a public accommodation is a physical place. Every term listed in § 12181(7) and subsection (F) is a physical place open to public access. The terms travel service, shoe repair service, office of an accountant or lawyer, insurance office, and professional office of a healthcare provider do not suggest otherwise. Rather than suggesting that Title III includes within its purview entities other than physical places, it is likely that Congress simply had no better term than "service" to describe an office where travel agents provide travel services and a place where shoes are repaired. Office of an accountant or lawyer, insurance office, and professional office of a healthcare provider, in the context of the other terms listed, suggest a physical place where services may be obtained and nothing more. To interpret these terms as permitting a place of accommodation to constitute something other than a physical place is to ignore the text of the statute and the principle of *noscitur a sociis.*

 Accordingly, we conclude that the provision of a long-term disability plan by an employer and administered by an insurance company does not fall within the purview of Title III.[10]

**B. Title I of the ADA Governs Employment Practices**

 Because the statutory framework of the ADA expressly limits discrimination in employment practices to Title I of the ADA, the District Court properly dismissed Schering–Plough, Parker's employer, from this action. As set out by the statute, Title I provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). The regulations governing the ADA specifically provide that it is unlawful for an employer to discriminate on the basis of disability against a qualified individual with a disability in regard to "[f]ringe benefits available by virtue of employment, whether or not administered by the [employer]." 29 C.F.R. § 1630.4(f)(1996). As noted by the Equal Employment Opportunity Commission ("EEOC"), the agency charged with administering and enforcing Title I of the

opportunity to adduce further evidence supporting their view that the defendants are places of 'public accommodation' within the meaning of Title III of the ADA." *Carparts,* 37 F.3d at 19.

**10.** We have not referred to legislative history in our discussion of this issue because, where the statutory meaning is clear, we do not resort to legislative history. *See United States v. Gonzales,* ─── U.S. ───, ───, 117 S.Ct. 1032, 1035, 137 L.Ed.2d 132 (1997)(citing *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 254, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992)).

ADA,[11] "[e]mployee benefit plans, including health insurance plans provided by an employer to its employees, are a fringe benefit available by virtue of employment. Generally speaking, therefore, the ADA prohibits employers from discriminating on the basis of disability in the provision of health insurance to their employees." EEOC: Interim Policy Guidance on ADA and Health Insurance, June 8, 1993, *reprinted in* Americans With Disabilities Act Manual (BNA) at 70:1051; *see also Hankins v. The Gap, Inc.,* 84 F.3d 797, 800 (6th Cir.1996)("Title I of the ADA ... prohibits unwarranted discrimination against disabled persons in employment."); *Stoutenborough v. National Football League, Inc.,* 59 F.3d 580, 583 (6th Cir.)("Title I prohibits employment discrimination by a 'covered entity'"), *cert. denied,* —— U.S. ——, 116 S.Ct. 674, 133 L.Ed.2d 523 (1995); *accord Equal Employment Opportunity Comm'n v. CNA Ins. Cos.,* 96 F.3d 1039 (7th Cir.1996)(EEOC brought suit under Title I challenging a disability policy provided by an employer, CNA Insurance Co., which provided twenty-four months of coverage for mental disabilities versus coverage of physical disabilities until age 65); *Krauel v. Iowa Methodist Medical Ctr.,* 95 F.3d 674 (8th Cir.1996)(alleged discrimination in self-funded health benefit plan provided by employer analyzed under Title I of the ADA); *Gonzales v. Garner Food Servs., Inc.,* 89 F.3d 1523 (11th Cir.1996)(whether former employee had standing to sue for cap on AIDS related benefits in an employer provided health plan analyzed under Title I of the ADA), *cert. denied,* —— U.S. ——, 117 S.Ct. 1822, 137 L.Ed.2d 1030 (1997); *Motzkin v. Trustees of Boston Univ.,* 938 F.Supp. 983, 996 (D.Mass.1996)(Title III did not apply to professor's employment discrimination claim against a university; "The legislative intent is so clear from the language of Titles I and

III that one need not go beyond that language to conclude that employment discrimination is the exclusive province of Title I")[12] .

It is, thus, clear that Schering–Plough is not a proper defendant under Title III, except to the extent that it is alleged to be a plan fiduciary; discrimination in the provision of fringe benefits during employment is governed strictly by Title I and the provision of a long-term disability plan is a fringe benefit of employment. *See, e.g., Equal Employment Opportunity Comm'n v. CNA Ins. Cos.,* 96 F.3d 1039, 1044 (7th Cir.1996)("One of th[e] terms, conditions, or privileges of employment may be a pension plan").

Because the provision of a long-term disability plan by an employer and administered by an insurance company does not fall within the purview of Title III and because the statutory framework of the ADA expressly limits discrimination in employment practices to Title I of the ADA, the District Court properly granted summary judgment on behalf of the defendants.

### C. The ADA Prohibits Only Discrimination Between the Disabled and Non–Disabled

■ The disparity in benefits provided in the policy at issue is also not prohibited by the ADA because the ADA does not mandate equality between individuals with different disabilities. Rather, the ADA prohibits discrimination between the disabled and the non-disabled; specifically, the ADA mandates that the owners, lessors, and operators of public accommodations provide equal access to the disabled and non-disabled. Because all employees at Schering–Plough, whether disabled or not, received the same access to the long-term disability plan, neither the defendants nor the plan discrimi-

---

**11.** *See* 42 U.S.C. § 12117.

**12.** The court in *Motzkin* further found that:

> it would make no sense to construe Title III as including employment practices within its scope. Indeed, to do so might wreak havoc with the careful balance that Congress attempted to strike in Title I between the rights of employers and the rights of workers with disabilities. For example, the term "qualified

> individual with a disability" appears in Title I, but is absent from Title III. As a result, if Title III were construed to apply to employment practices, an employer would be within its rights under Title I, but might be liable under Title III, if it denied employment to an individual who, because of a disability, was incapable of performing the essential functions of the job. *Motzkin,* 938 F.Supp. at 996 (citations omitted).

nated between the disabled and the able bodied.

In *Traynor v. Turnage*, 485 U.S. 535, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988), the Supreme Court considered whether a benefit given to a certain class of disabled persons and not to others violated the Rehabilitation Act, 29 U.S.C. § 794.[13] At issue in *Traynor* was the Veterans' Readjustment Benefit Act of 1966 ("GI Bill"), 38 U.S.C. § 1661, which affords educational assistance benefits to honorably discharged veterans. The benefits ordinarily must be used within ten years following the veteran's discharge; however, if the veteran was unable to utilize his or her benefits within the ten year period due to " 'a physical or mental disability which was not the result of [their] own willful misconduct,' " the veteran may obtain an extension. *Id.* at 538, 108 S.Ct. at 1376 (citing 38 U.S.C. § 1662(a)(1)). The petitioners in *Traynor* sought an extension because their alcoholism rendered them disabled during the ten year period following their discharge. *Id.* The Veterans' Administration denied the requested extensions because it concluded that their alcoholism constituted "willful misconduct." *Id.*

The petitioners' contention that the "willful misconduct" provision of the GI Bill violated the Rehabilitation Act was rejected by the Court. *Id.* at 548–49, 108 S.Ct. at 1382. In rejecting the petitioners' argument, the Court noted that the central purpose of the Rehabilitation Act is "to assure that handicapped individuals receive 'evenhanded treatment' in relation to nonhandicapped individuals." *Id.* at 548, 108 S.Ct. at 1382 (citations omitted). The Court clarified that "[t]his litigation does not involve a program or activity that is alleged to treat handicapped persons less favorably than nonhandicapped persons." *Id.* Rather, the "willful misconduct"

provision "provides a special benefit to disabled veterans who bear no responsibility for their disabilities that is not provided to other disabled veterans or to any able-bodied veterans." *Id.* at 549, 108 S.Ct. at 1382. The benefits provided to a particular class did not violate the Act, in the Court's view, because "[t]here is nothing in the Rehabilitation Act that requires that any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons." *Id.* Thus, the Court held it is "not inconsistent with the Rehabilitation Act for only those veterans whose disabilities are not attributable to their own 'willful misconduct' to be granted extensions of the 10–year delimiting period applicable to all other veterans." *Id.; see also Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985)(Tennessee's generalized limitations on Medicaid payments, which fell disproportionally on disabled individuals because of their greater medical needs, did not violate the Rehabilitation Act).

Following the Supreme Court's decision in *Traynor*, the United States Court of Appeals for the District of Columbia held in *Modderno v. King*, 82 F.3d 1059 (D.C.Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 772, 136 L.Ed.2d 717 (1997), that the Foreign Service Benefit Plan provided to foreign service officers and their spouses, which limited lifetime coverage for mental health benefits to $75,-000 while placing no similar restriction on benefits for physical illnesses, did not violate the Rehabilitation Act. The D.C. Circuit found that, if across-the-board limits were permissible in *Alexander v. Choate*, then an insurance provider could cap the benefits for all illnesses. *Id.* at 1062. When an insurance provider, instead, places a limit on only one type of illness, such as mental illness, the disabled, as a class, benefit; if the cap were

---

**13.** The Rehabilitation Act, as amended, provides that:

> No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a). Over sixteen years after the Rehabilitation Act was enacted, Congress, concerned that the Rehabilitation Act alone was inadequate to eradicate discrimination against the disabled, signed into law the ADA, which has a broader scope than the Rehabilitation Act. *See Helen L. v. DiDario*, 46 F.3d 325, 331 (3d Cir.)(citing S.Rep. No. 116, 20; H.R.Rep. No. 485(II), 50), *cert. denied*, —— U.S. ——, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995).

placed on all illnesses, the disabled as a class would be worse off, in the court's view. According to the court, "[i]f [the Rehabilitation Act] permits across-the-board limits on coverage, as *Alexander* holds, then it cannot forbid partial limits that leave some disabled individuals better off and the remainder no worse off." *Id.* (citing *Traynor v. Turnage,* 485 U.S. 535, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988)). Accordingly, the court concluded that "distinctions between mental and physical care are no more vulnerable under § 504 [the Rehabilitation Act] than are completely generalized limits."[14] *Id.; see also Wolford v. Lewis,* 860 F.Supp. 1123, 1134 (S.D.W.Va. 1994)(the Rehabilitation Act "ensures only that disabled individuals receive the same treatment as those who are not disabled.")

Citing to *Alexander v. Choate* and the D.C. Circuit's decision in *Modderno,* the United States Court of Appeals for the Seventh Circuit in *Equal Employment Opportunity Commission v. CNA Insurance Cos.,* 96 F.3d 1039 (7th Cir.1996), held that a limitation on mental health benefits in a long-term disability plan does not violate the ADA. In *CNA Insurance,* the defendant companies offered a long-term disability policy to their employees in which benefits for mental illness were paid only for a two-year period while benefits for physical illnesses were paid until the employee reached age sixty-five. *Id.* at 1041. The EEOC brought suit against the defendants after an employee was informed by defendants that benefits for her mental disorder would be paid only for twenty-four months. In determining whether the former employee had standing to sue under the ADA for discrimination occurring during the employment period, the Seventh Circuit held that the employee suffered no discrimination under Title I of the ADA while she was employed. *Id.* at 1045. In the court's words:

> [a]ll employees—the perfectly healthy, the physically disabled, and the mentally disabled—had a plan that promised them long-term benefits from the onset of disability until age 65 if their problem was physical, and long-term benefits for two years if the problem was mental or nervous. This may or may not be an enlightened way to do things, but it was not discriminatory in the usual sense of the term.

*Id.* at 1044 (citing *Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985); *Modderno v. King,* 82 F.3d 1059 (D.C.Cir.1996)). In determining whether the plan discriminates against employees who will sometime in the future become mentally disabled because they are unknowingly purchasing only twenty-four months of benefits, the court stated:

> However this is dressed up, it is really a claim that benefit plans themselves may not treat mental health conditions less favorably than they treat physical health conditions. Without far stronger language in the ADA supporting this result, we are loath to read into it a rule that has been the subject of vigorous, sometimes contentious, national debate for the last several years. Few, if any, mental health advocates have thought that the result they would like to see has been there all along in the ADA. This is well-illustrated by the debate over a proposed amendment to the Health Insurance Portability and Accountability Act of 1996. The amendment, which was defeated before final passage of the bill, would have required parity of coverage for mental and physical conditions. This debate reinforces our conclusion based on the language of the ADA that the issue of parity among physical and mental health benefits is one that is still in the legislative arena.

*Id.* (citations omitted).

On September 26, 1996, the day before the Seventh Circuit's decision in *CNA Insurance* was released, Congress enacted the Mental Health Parity Act, 42 U.S.C. § 300gg-5, as an amendment to the Health Insurance Portability Act.[15] *See* 42 U.S.C. § 300gg. The

---

14. The court in *Modderno* also held that the cap on mental health benefits under the plan would not constitute a subterfuge under Title IV of the ADA which applies to the Rehabilitation Act. *See Modderno,* 82 F.3d at 1063–65.

15. The Mental Health Parity Act was also enacted subsequent to the panel's decision in *Parker.*

Mental Health Parity Act mandates, *inter alia*, that where a health insurance plan contains no lifetime limit or annual limit for medical or surgical benefits, the plan may not contain a lifetime or annual limit for mental health benefits. *See* 42 U.S.C. § 300gg–5(1)–(2). Similarly, if the health insurance policy includes an annual or lifetime limit on medical or surgical benefits, the plan must apply the same limits to mental health benefits. *Id.* As several of the amici curiae argue, Congress' passage of the Mental Health Parity Act suggests Congress believed that the ADA neither governs the content of insurance policies nor requires parity between physical and mental illnesses; thus, passage of a law requiring such parity was required if Congress desired insurance carriers to cease including disparate mental and physical health benefits in insurance policies. Particularly pertinent to the instant case, however, the Health Insurance Portability Act specifically exempts from its coverage "disability income insurance." 42 U.S.C. § 300gg–91(c)(1)(A). While Congress likely realized that equality between the two types of disabilities was not covered by the ADA, it sought to remedy the absence only in the context of health insurance coverage, not long-term disability policies. Thus, it appears that Congress did not believe the necessity for parity between mental and physical disabilities in long-term disability plans was sufficiently compelling to include them within the purview of the Act.[16]

Without discussing the Mental Health Parity Act,[17] the United States Court of Appeals for the Eighth Circuit in *Krauel v. Iowa Methodist Medical Center*, 95 F.3d 674 (8th Cir.1996), held that the ADA prohibits only discrimination between the disabled and nondisabled. In *Krauel*, an employee brought suit under the ADA against her employer alleging that the exclusion of infertility treatments from her employee medical benefits plan constituted discrimination because the exclusion was a disability based distinction. The Eighth Circuit, citing to EEOC guidelines interpreting the ADA, held that "[i]nsurance distinctions that apply equally to all insured employees, that is, to individuals with disabilities and to those who are not disabled, do not discriminate on the basis of disability." *Id.* at 678. The court specifically cited to the language of the following EEOC guideline for support:

> . . . a feature of some employer provided health insurance plans is a distinction between the benefits provided for the treatment of physical conditions on the one hand, and the benefits provided for the treatment of "mental/nervous" conditions on the other. Typically, a lower level of benefits is provided for the treatment of mental/nervous conditions than is provided for the treatment of physical conditions. Similarly, some health insurance plans provide fewer benefits for "eye care" than for other physical conditions. Such broad distinctions which apply to the treatment of a multitude of dissimilar conditions and which constrain individuals both with and without disabilities, are not distinctions based on disability. Consequently, although such distinctions may have a greater impact on certain individuals with disabilities, they do no intentionally discriminate on the basis of disability and do not violate the ADA.

*Id.* (quoting EEOC: Interim Enforcement Guidance on Application of ADA to Health Insurance, (June 8, 1993), *reprinted in* Fair. Empl. Prac. Man. 405:7115, 7118(BNA)). In accordance with these guidelines, the court concluded that the plan's exclusion of benefits for infertility treatments did not single out a particular group of disabilities. "Rather, the Plan's infertility exclusion applies equally to all individuals, in that no one participating in the Plan receives coverage for treatment of infertility problems." *Id.* at 678. Thus, the court held, the plan did not contain a disability-based distinction. *Id.; see also Cramer v. State of Florida*, 885 F.Supp. 1545, 1550–1553 (M.D.Fla.1995)(cit-

---

**16.** The converse cannot be argued: Congress did not need to include long-term disability plans in the Mental Health Parity Act because the ADA required parity in such plans. It simply cannot be the case that the ADA would cover long-term disability plans but not group health insurance plans.

**17.** The Mental Health Parity Act was enacted two weeks after the opinion in *Krauel* was released.

ing *Alexander v. Choate* and *Traynor v. Turnage*, the court held that "the ADA applies only to discrimination against disabled persons compared to non-disabled persons"; it does "not ensure 'evenhanded treatment' as compared to other disabled persons."), *aff'd*, 117 F.3d 1258 (11th Cir.1997); *Williams v. Secretary of the Executive Office of Human Servs.*, 414 Mass. 551, 609 N.E.2d 447, 454 (1993)("The focus of Federal disability discrimination statutes is to address discrimination in relation to nondisabled persons, rather than to eliminate all differences in levels or proportions of resources allocated and services provided to individuals with differing types of disabilities.").

■ In conclusion, we agree with those circuits that have extended the Supreme Court's holdings in *Traynor v. Turnage* and *Alexander v. Choate* to the ADA. As the Court concluded regarding the Rehabilitation Act, the ADA similarly does not prohibit an insurance company from differentiating between different disabilities. The same policy is provided to all employees who, when they receive it, are not disabled but working. The fact that some may become disabled for different reasons does not amount to discrimination in providing the policy. The ADA simply does not mandate equality between individuals with different disabilities. Rather, the ADA, like the Rehabilitation Act, prohibits discrimination between the disabled and the non-disabled.

### IV.

For the foregoing reasons, the judgment of the District Court is **AFFIRMED**.

BOYCE F. MARTIN, JR., Chief Judge, dissenting.

I join Judge Merritt and others in dissenting from the opinion of the Court in this case. I write separately to highlight my agreement with Judge Merritt regarding congressional intent and to emphasize my disagreement with the majority's interpretation of *Stoutenborough v. National Football League, Inc.*, 59 F.3d 580 (6th Cir.1995).

In *Stoutenborough*, a hearing impaired individual and an association of hearing impaired individuals sought to prohibit the National Football League, its member clubs, and several broadcast companies from using the so-called "blackout rule" to avoid broadcasting live local football games when tickets to the live game had not been completely sold seventy-two hours before the game. With regard to Stoutenborough's Title III claim, we stated that "plaintiff's argument that the prohibitions of Title III are not solely limited to 'places' of public accommodation contravenes the plain language of the statute." *Id.* at 583.

The majority takes this language to mean that Title III's mandates are limited to physical structures. However, *Stoutenborough* recognized that, in the context of a Title III claim, the term "place" is a defined term; we recognized that "a 'place' is '[1] a facility, [2] operated by a private entity, [3] whose operations affect commerce and [4] fall within at least one of the twelve "public accommodation" categories.' " *Id.* Because the defendants in *Stoutenborough*, did not fall within one of the twelve public accommodation categories, they were not "places" of public accommodation as required for Title III protection. Thus, although *Stoutenborough* limited Title III's applicability to "places," it did so in the context of the defined meaning of the term "place." Unlike the defendants in *Stoutenborough*, Title III specifically identifies an "insurance office" as a public accommodation. 42 U.S.C. § 12181(7)(F).

Not only does the majority view incorrectly apply *Stoutenborough*, it also directly conflicts with the conclusion reached by the First Circuit. In *Carparts Distribution Ctr. v. Automotive Wholesalers Ass'n of New England*, 37 F.3d 12 (1st Cir.1994), the First Circuit held that, by including travel services in the list of public accommodations, Congress chose not to limit Title III protections to physical structures. The *Carparts* court wrote: "It would be irrational to conclude that persons who enter an office to purchase services are protected by the ADA, but persons who purchase the same services over the telephone or by mail are not. Congress could not have intended such an absurd result." *Id.* at 19. Similarly, Judge Merritt notes that, under the majority view, individuals who purchase insurance through an insur-

ance office are entitled to Title III protections while those who purchase insurance through their employers receive no Title III protections.

In my view, Judge Merritt and the First Circuit present a more compelling argument. As the First Circuit noted, "[t]he purpose of Title III is 'to bring individuals with disabilities into the economic and social mainstream of American life .... in a clear, balanced, and reasonable manner.' " *Id.* (citing H.R.Rep. No. 485, 101st Cong., 2d Sess., pt. 2, at 99 (1990) *reprinted in* 1990 U.S.C.C.A.N. 303, 382).

By limiting Title III's applicability to physical structures, the majority interprets Title III in a manner completely at odds with clear congressional intent. In recent years, the economic and social mainstream of American life has experienced significant change due to technological advances. An increasing array of products and services are becoming available for purchase by telephone order, through the mail, via the Internet, and other communications media. Unfortunately, under the majority view, the same technological advances that have offered disabled individuals unprecedented freedom may now operate to deprive them of rights that Title III would otherwise guarantee. As the modern economy increases the percentage of goods and services available through a marketplace that does not consist of physical structures, the protections of Title III will become increasingly diluted.

In my view, the majority view incorrectly applies a prior opinion of this Court and reaches a conclusion clearly at odds with congressional intent. Accordingly, I join Judge Merritt and respectfully dissent.

MERRITT, Circuit Judge, dissenting.

I would adhere to the panel's interpretation with respect to the application to group health and disability insurance policies of Titles III and IV of the Americans with Disabilities Act, 42 U.S.C. §§ 12182, 12201. The panel's reasoning is fully set out in its published decision, *Parker v. Metropolitan Life Ins. Co.,* 99 F.3d 181 (6th Cir.1996). It reaches the conclusion that the statute covers group health and disability insurance provid-

ed by insurance companies through an insured's employer, as well as insurance provided by walk-in insurance agencies.

Our Court has now held that the provisions of the Disabilities Act simply do not cover employee health and disability insurance plans because "a benefit plan offered by an employer is not a good offered by a place of public accommodation" (Op. p. 1010). Footnotes 4 and 9 of the Court's opinion notwithstanding, according to the express language of the Court's opinion, Parker is not covered because she got her coverage from MetLife through the employer instead of walking into a MetLife office and buying it.

> [T]he good that plaintiff seeks is not offered by a place of public accommodation. The public cannot enter the office of MetLife or Schering–Plough and obtain the long-term disability policy that plaintiff obtained. Parker did not access her policy from MetLife's insurance office. Rather, she obtained her benefits through her employer.

(Op. p. 1011.) Footnotes 4 and 9 are *post hoc* efforts by the Court to do an about face and march off in a different direction, or at least bury its head in the sand.

Our Court's decision that the Disabilities Act does not cover employer-sponsored plans flies in the face of § 501(c) of the Act, 42 U.S.C. § 12201(e), entitled "Insurance" (attached as an addendum to this opinion), which immediately follows the Title III coverage provision prohibiting discrimination. It provides a "safe harbor" for insurance companies in certain respects. If Title III does not cover the millions of employees covered by health and disability insurance policies, as our Court has now held, it is difficult to see why Congress would provide a qualified exemption for insurance companies. It is also difficult to see why the House and Senate Committee Reports would treat such insurance as covered by the Act, as the following quotes clearly demonstrate:

> Under the [Disabilities Act], a person with a disability cannot be denied insurance or be subject to different terms or conditions of insurance based on disability alone, if

the disability does not impose increased risks.

. . . .

Moreover, while a plan which limits certain kinds of coverage based on classification of risk would be allowed under this section [codified at 42 U.S.C. § 12201(c) ], the plan may not refuse to insure, or refuse to continue to insure, or limit the amount, extent, or kind of coverage available to an individual, or charge a different rate for the same coverage solely because of a physical or mental impairment, except where the refusal, limitation, or rate differential is based on sound actuarial principles or is related to actual or reasonably anticipated experience.

For example, a blind person may not be denied coverage based on blindness independent of actuarial risk classification.

H.R.Rep. No. 485, 101st Cong., 2nd Sess., pt. II, at 136–37 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 303, 419–20. The explanation continues:

> In sum, section 501(c) [the safe-harbor provision] is intended to afford to insurers and employers the same opportunities they would enjoy in the absence of the legislation to design and administer insurance products and benefit plans in a manner that is consistent with basic principles of insurance risk classification. This legislation assures that decisions concerning the insurance of persons with disabilities which are not based on bona fide risk classification be made in conformity with non-discrimination requirements. Without such clarification, this legislation could arguably find violative of its provisions any action taken by an insurer or employer which treats disabled persons differently under an insurance or benefit plan because they represent an increased hazard of death or illness.
>
> . . . .

*Id.* at 137–38, reprinted in 1990 U.S.C.C.A.N. at 420–21. Another House report states:

> [Section 12201] specifies that titles I, II, and III shall not be construed to restrict various insurance practices on the part of insurance companies and employers, as long as such practices are not used to evade the purposes of this Act.
>
> . . . .
>
> Specifically, [Section 12201(c)(1) ] makes it clear that insurers may continue to sell to and underwrite individuals applying for life, health, or other insurance on an individually underwritten basis, or to service such products, so long as the standards used are based on sound actuarial data and not on speculation.
>
> . . . .
>
> In sum, [the Disabilities Act] requires that underwriting and classification of risks be based on sound actuarial principles or be related to actual or reasonably anticipated experience.

H.R.Rep. No. 485, 101st Cong., 2nd Sess. pt. III, at 70 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 493. The Senate report contains an explanation nearly identical to those quoted above. *See* S.Rep. No. 116, 101st Cong., 1st Sess. 84–86 (1989). In addition, the Senate Report states:

> The Committee does not intend that any provisions of this legislation should affect the way the insurance industry does business in accordance with the State laws and regulations under which it is regulated. Virtually all States prohibit unfair discrimination among persons of the same class and equal expectation of life. The [Disabilities Act] adopts this prohibition of discrimination. Under the [Disabilities Act], a person with a disability cannot be denied insurance or be subject to different terms or conditions of insurance based on disability alone, if the disability does not pose increased risks. *Id.* at 84.

It is strange, indeed, that Congress would put § 501(c) in the Act and write these committee reports if Congress did not include employer-sponsored health and disability insurance in the prohibition against discrimination based on disability. It boggles the mind to think that Congress would include only the few people who walk into an insurance office to buy health insurance but not the millions who get such insurance at work. This distinction drawn by the Court produces an absurd result.

The Court limits § 12182(a) "to physical access to an office," rejecting the contrary view of the other circuit and district courts that have decided the issue, as well rejecting the Department of Justice and the EEOC view that employer group health insurance is covered. In the end, the unnecessary conflict between these two views will now have to be resolved by the Supreme Court.

The fact that Congress intended that health and disability insurance for employees is covered by Titles III and IV does not necessarily mean that insurance companies lose. It means merely, as noted in the panel decision, that insurance practices, including the insurance industry's justification for its distinction between mental and physical disabilities, are fully protected to the extent they are in accord with sound actuarial principles, reasonably anticipated experience and bona fide risk classification. The case, as the panel held, should be remanded to the district court for further consideration of the factual and legal issues arising under Title IV from the insurance industry's asserted distinction between mental and physical disabilities.

### *ADDENDUM*

**(c) Insurance**

Subchapters I through III of this chapter and title IV of this Act shall not be construed to prohibit or restrict—

(1) an insurer, hospital or medical service company, health maintenance organization, or any agent, or entity that administers benefit plans, or similar organizations from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law; or

(2) a person or organization covered by the chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that are based on understanding risks, classifying risks, or administering such risks that are based on or not inconsistent with State law; or

(3) a person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that is not subject to State laws that regulate insurance.

Paragraphs (1), (2), and (3) shall not be used as a subterfuge to evade the purposes of subchapter I and III of this chapter.