Filed 9/13/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DOMINICK MARTIN et al., | |
| Plaintiffs and Appellants, | G061234 |
| v. | (Super. Ct. No. 30-2020-01176205) |
| THI E-COMMERCE, LLC, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Theodore R. Howard, Judge. Affirmed. Motion for judicial notice granted.

Pacific Trial Attorneys, Scott J. Ferrell, David W. Reid, Victoria C. Knowles, and Richard H. Hikida for Plaintiffs and Appellants.

Blank Rome and Harrison Brown for Defendant and Respondent.

\*          \*          \*

This appeal arises from a judgment of dismissal following an order sustaining defendant Thi E-Commerce, LLC's (Thi E-Commerce) demurrer. Plaintiffs Dominick Martin and Rusty Rendon, who allege they are blind, filed suit under the Unruh Civil Rights Act (Civ. Code, § 51 et seq.; Unruh Act) for disability discrimination, contending that one of Thi E-Commerce's Web sites discriminates against the blind by being incompatible with screen reading software. Plaintiffs contend the court erred by concluding that a Web site is not a place of public accommodation under the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.; ADA) (which is incorporated into the Unruh Act). Although this is an issue that has split the federal courts (as well as this panel), we conclude the ADA unambiguously applies only to physical places. Moreover, even if we were to find ambiguity and decide the issue on the basis of legislative history and public policy, we would still conclude that the ADA does not apply to Web sites.

Plaintiffs alternatively contend they stated a cause of action against Thi E-Commerce on a theory of intentional discrimination. We conclude the allegations of the complaint do not state a claim under that theory either and affirm the judgment.

ALLEGATIONS AND PROCEDURAL HISTORY

The first amended complaint alleged as follows: Plaintiffs are blind and require screen reading software to read Web site content. Thi E-Commerce maintained its Web site <https://realtruck.com/> (as of Sept. 7, 2023), archived at: <https://perma.cc/96GY-PXA5> in a manner that "contained numerous access barriers preventing Plaintiff, and other blind and visually impaired individuals, from gaining equal access to the [Web site]." "The [Web site] provides access to Defendant's array of products and services, including descriptions of its products, amenities and services, online shop, and many other benefits related to its products and services." The access barriers included missing alternative text, which is text that describes images such as a nonblind person sees when hovering a mouse cursor over an image, missing form labels,

2

and redundant links that result in additional navigation and repetition for screen reader users.

Plaintiffs are "testers," which means they are individuals with disabilities who visit places of public accommodation to determine their compliance with the ADA. The complaint stated a single cause of action for violation of the Unruh Act by "denying visually-impaired customers the services and products provided by the [Web site]." Plaintiffs alleged, "Defendant . . . violated the Unruh Civil Rights Act because the conduct alleged herein likewise constitutes a violation of various provisions of the ADA, 42 U.S.C. § 12101 *et seq.* Section 51(f) of the California Civil Code provides that a violation of the right of any individual under the ADA shall also constitute a violation of the Unruh Civil Rights Act."

As part of the same cause of action, plaintiffs further alleged, "At all relevant times, Defendant's actions constituted intentional discrimination against Plaintiffs on the basis of a disability in violation of the Unruh Civil Rights Act because Defendant constructed a [Web site] that was inaccessible to Plaintiffs, knowingly maintained the [Web site] in this inaccessible form, and failed to take adequate actions to correct these barriers even after being notified of the discrimination that such barriers cause. In particular, on or about December 14, 2019, Defendant received a letter sent via overnight delivery (FedEx) from Plaintiff's counsel on December 13, 2019, informing Defendant regarding the inaccessibility of its [Web site], which interfered with Plaintiffs' personal attempts to use the [Web site]. Such letter also informed Defendant that Plaintiffs' counsel represented 'blind' individuals, and warned Defendant that Plaintiffs intended to 'file suit' 'shortly.' Such letter concluded by inviting Defendant via its counsel to promptly contact Plaintiffs' counsel if Defendant wished to either discuss the matter or desired 'additional information about these claims.' . . . Defendant failed to respond to such letter at all."

Plaintiffs attached their attorney's demand letter to the complaint. The letter, which is less than half of a page long, simply stated, "In short, your [Web site] . . . is not fully accessible to visually-impaired individuals, which subjects you to liability under both California and federal law." The letter did not provide any detail describing the nature of the accessibility barriers.

The trial court sustained a demurrer by Thi E-Commerce without leave to amend.[1] The court noted that a plaintiff may proceed with an Unruh Act cause of action on either of two theories: a violation of the ADA or intentional discrimination. With regard to the ADA, the court applied the "majority view" that Web sites are not public accommodations under the ADA unless barriers present in the Web site impede a disabled person's access to benefits at a defendant's physical facility. No such physical facility was alleged. As to intentional discrimination, the court noted that plaintiff's factual premise—Thi E-Commerce's failure to respond to plaintiffs' demand letter—was insufficient to show intent.

Following a judgment in favor of Thi E-Commerce, plaintiffs timely appealed.


DISCUSSION

On appeal, plaintiffs contend the court erred in sustaining a demurrer to their Unruh Act cause of action. The Unruh Act provides: "All persons within the jurisdiction of this state . . . no matter what their . . . disability . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (Civ. Code, § 51, subd. (b).) "A plaintiff can recover under the [Unruh Act] on two alternate theories: (1) a violation of the ADA

---

[1] The court previously sustained a demurrer to the original complaint with leave to amend. The first amended complaint did not make extensive changes, the primary change being the attachment of plaintiffs' demand letter.

4

[citation]; or (2) denial of access to a business establishment based on intentional discrimination." (*Martinez v. San Diego County Credit Union* (2020) 50 Cal.App.5th 1048, 1059 (*SDCCU*).) Plaintiffs contend the court erred both by concluding a Web site is not subject to the ADA and that plaintiffs failed to allege intentional discrimination. We review each contention in turn.

*A Stand-alone Web site is Not a Place of Public Accommodation*

Title III of the ADA provides, "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." (42 U.S.C. § 12182(a).) "To prevail on a Title III discrimination claim, the plaintiff must show that (1) she is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied public accommodations by the defendant because of her disability." (*Molski v. M.J. Cable, Inc.* (9th Cir. 2007) 481 F.3d 724, 730.) The present appeal presents the threshold issue of whether a stand-alone Web site (i.e., a Web site without any significant connection to a physical location open to the public) is a "place of public accommodation."

The ADA defines the phrase "place of public accommodation" in terms of a list of 12 categories, each of which has specific examples. In particular, title 42 of the United States Code section 12181(7)(A)-(L) (section 12181(7)), lists the following: "(7) Public accommodation [¶] The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce— [¶] (A) an inn, hotel, motel, or other place of lodging . . . ; [¶] (B) a restaurant, bar, or other establishment serving food or drink; [¶] (C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment; [¶]

5

(D) an auditorium, convention center, lecture hall, or other place of public gathering;  [¶]  (E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;  [¶]  (F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;  [¶]  (G) a terminal, depot, or other station used for specified public transportation;  [¶]  (H) a museum, library, gallery, or other place of public display or collection;  [¶]  (I) a park, zoo, amusement park, or other place of recreation;  [¶]  (J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;  [¶]  (K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and  [¶]  (L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation."

The relevant federal regulation defines a place of public accommodation by largely parroting title 42 of the United States Code section 12181, except the regulation adds that a place of public accommodation is a "facility."  (28 C.F.R. § 36.104 (2022).)  It defines the term facility as "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located."  (*Ibid.*)

"A [Web site] is not identified in any of the statutory categories.  This is not surprising as there were no commercial [Web sites] when the ADA was enacted in 1990.  But in the 30 years since, [Web sites] have become central to American life.  They are widely used by both consumers and businesses to communicate information and conduct transactions, and are now essential tools in conducting daily affairs.  Thus, the issue whether [Web sites] are subject to ADA requirements has been the subject of a growing

6

number of lawsuits, judicial attention, and academic commentary." (*SDCCU, supra,* 50 Cal.App.5th at p. 1061, fn. omitted.)

Whether a Web site is subject to the ADA has occasioned a split of authority among the federal courts. There is broad agreement that a Web site is subject to the ADA if it operates as a gateway or nexus to a physical location. (See, e.g., *Robles v. Domino's Pizza, LLC* (9th Cir. 2019) 913 F.3d 898; *Haynes v. Dunkin' Donuts LLC* (11th Cir. 2018) 741 Fed.Appx. 752.) Where the federal courts differ is on the precise issue before us: whether a stand-alone Web site is subject to the ADA. (See *SDCCU, supra,* 50 Cal.App.5th at pp. 1061-1062 [describing the split of authority].) The split of authority tracks a broader issue, which arose prior to the Web site cases; namely: Does the ADA apply only to physical locations open to the public? The federal courts have treated the answer to the broader question as determinative of the issue of Web sites. (Compare *National Assn. of the Deaf v. Netflix, Inc.* (D.Mass. 2012) 869 F.Supp.2d 196, 201 (*Netflix*) [ADA applies to stand-alone Web sites]; with *Earll v. eBay, Inc.* (9th Cir. 2015) 599 Fed.Appx. 695 [contra].)

1. The ADA Requires a Physical Location

We turn now to a discussion of each side of the debate. The "minority view" (*SDCCU, supra,* 50 Cal.App.5th at p. 1062) is perhaps best illustrated by the First Circuit's decision in *Carparts Distribution Center v. Automotive Wholesaler's* Assn. (1st Cir. 1994) 37 F.3d 12 (*Carparts*). There, the plaintiff was diagnosed with AIDS but his employment-based medical reimbursement plan limited benefits for AIDS-related illness to $25,000, significantly less than the otherwise applicable limit of $1 million. (*Id.* at p. 14.) Plaintiff sued, contending the limitation violated the ADA. (*Carparts*, at p. 14.) The trial court dismissed the action, finding that the ADA applies only to physical structures. (*Carparts*, at pp. 15, 18.) The *Carparts* court reversed. The court reasoned, "By including 'travel service' among the list of services considered 'public

7

accommodations,' Congress clearly contemplated that 'service establishments' include providers of services which do not require a person to physically enter an actual physical structure. Many travel services conduct business by telephone or correspondence without requiring their customers to enter an office in order to obtain their services. Likewise, one can easily imagine the existence of other service establishments conducting business by mail and phone without providing facilities for their customers to enter in order to utilize their services. It would be irrational to conclude that persons who enter an office to purchase services are protected by the ADA, but persons who purchase the same services over the telephone or by mail are not. Congress could not have intended such an absurd result." (*Id.* at p. 19.) The court went on to reason that the ADA's sweeping ameliorative purpose required a broad interpretation. (*Ibid.*)

The Second Circuit reached a similar conclusion. In *Pallozzi v. Allstate Life Ins. Co.* (2nd Cir. 1999) 198 F.3d 28, the court held that a life insurance company was a place of public accommodation, relying on the fact that the ADA lists "'insurance office'" among public accommodations. (*Pallozzi*, at p. 31.) In response to an argument that the ADA covers only the *office* not the company, the court relied on *Carparts* to conclude that the product itself is covered by the ADA, not just the office. (*Pallozzi*, at pp. 32-33.)

The Seventh Circuit has expressed in dicta that a physical location is not required, and it even expressed the view that a Web site is a place of public accommodation. In *Doe v. Mutual of Omaha Ins. Co.* (7th Cir. 1999) 179 F.3d 557, the court described title III the ADA as follows: "The core meaning of this provision, plainly enough, is that the owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, Web site, or other facility (whether in physical space or in electronic space, [citing *Carparts*]) that is open to the public cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do." (*Mutual of Omaha Ins. Co.,* at p. 559.) We describe this as dicta,

8

however, because the case had nothing to do with a Web site or even a physical location but was instead concerned with whether the *content* of an insurance policy could discriminate among different diseases. (*Id.* at p. 558.)

Representative of the "majority view" (*SDCCU*, *supra*, 50 Cal.App.5th at p. 1063) is *Parker v. Metropolitan Life Ins. Co.* (6th Cir. 1997) 121 F.3d 1006. This was another case involving an insurance company. In this case, the insurer offered a disability policy that contained more generous benefits for disabilities resulting from physical illness than disabilities resulting from mental illness. (*Id.* at p. 1008.) The court concluded that "a public accommodation is a physical place . . . ." (*Id.* at p. 1010.) The court observed that what title III prohibits is discrimination in the services of a *place* of public accommodation. Under the applicable regulations, a place is defined as a facility that falls under one of the 12 listed categories in the ADA. A facility, in turn, is defined as "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located." (28 C.F.R. § 36.104 (2022).) The insurance company did not have a place open to the public. In reaching this conclusion, the *Parker* court criticized the *Carparts* opinion, arguing that its overreliance on the mention of a "travel service" in title III ignored the principle of *noscitur a sociis*—i.e., the meaning of a term should be derived from its context and accompanying terms. (*Parker,* at p. 1014.) "The clear connotation of the words in § 12181(7) is that a public accommodation is a physical place. Every term listed in § 12181(7) and subsection (F) is a physical place open to public access." (*Ibid.*)

The Ninth Circuit came to a similar conclusion. (*Weyer v. Twentieth Century Fox Film Corp.* (9th Cir. 2000) 198 F.3d 1104, 1114 ["All the items on this list, however, have something in common. They are actual, physical places where goods or services are open to the public, and places where the public gets those goods or

9

services"].)  As did the Fifth Circuit (*Magee v. Coca-Cola Refreshments USA, Inc.* (5th Cir. 2016) 833 F.3d 530) and the Third Circuit (*Ford v. Schering-Plough Corp.* (3rd Cir. 1998) 145 F.3d 601).

Having set out the overall debate, we turn to our analysis of the issue before us.  We reach two conclusions:  first, the ADA unambiguously requires a physical location; second, even if the language were ambiguous, the unique history and regulation of the Internet counsel against interpreting the ADA as applying to the Internet.

"[T]he fundamental goal of statutory interpretation is to ascertain and carry out the intent of the Legislature."  (*People v. Cruz* (1996) 13 Cal.4th 764, 782.) "'To determine legislative intent, a court begins with the words of the statute, because they generally provide the most reliable indicator of legislative intent.' [Citation.] . . . [Citation.]  'If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs.'"  (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1047.)

We agree with the majority view that a "place of public accommodation" requires a physical location.  We reach this conclusion because (1) it is the most natural usage of the phrase "*place* of public accommodation"; (2) the examples listed in section 12181(7) are all places that traditionally operate out of a physical location open to the public; and (3) the relevant regulations define the phrase in terms of a "facility," which, in turn, is defined in terms of physical structures.  Combined, these textual indicators leave no room for ambiguity.

A little over four months after plaintiffs filed their notice of appeal in this case, the Second District Court of Appeal decided *Martinez v. Cot'n Wash, Inc.* (2022) 81 Cal.App.5th 1026 (*Cot'n Wash*), a case that is on all fours with the present appeal.  Indeed, the plaintiff in *Cot'n Wash* was represented by the same attorneys who represent the plaintiffs here, both at the trial court and on appeal.  It appears the same arguments were raised in both appeals.

10

The *Cot'n Wash* court reached the same conclusion we do regarding the requirement of a physical space. "First, the plain meaning of the term 'place' weighs against adopting [the plaintiff's] proposed interpretation. Dictionaries 'overwhelmingly' define 'place' as involving a physical location. [Citation.] Neither Title III nor any implementing regulations provide a different definition of the word for the purposes of Title III. Nor does the state of technology when the ADA was passed in 1990 suggest that Congress was unaware that the term carried a connotation of physical space and thus could exclude certain 'sales and retail establishments' from the scope of Title III based on a lack of connection to a physical space. '[T]here were countless . . . businesses operating outside of brick-and-mortar premises in 1990, including some that had been in operation for decades,' such as mail order catalogs. [Citation.] Congress's decision to nevertheless use the phrase 'place,' the plain meaning of which involves physical space, could easily be understood as an intentional exclusion of businesses without any physical presence from the scope of Title III—even if they might constitute 'sales and retail establishments' under section 12181(7) . . . . Finally, the United States Supreme Court has recently noted 'place' connotes a physical space, at least in the context of a New Jersey law protecting against discrimination in 'places of public accommodation.' [Citation.] Specifically, the court reversed a summary judgment ruling that treated the Boy Scouts organization as a 'place of public accommodation' under New Jersey law, noting that, although such laws have been interpreted broadly, 'the New Jersey Supreme Court went a step further and applied its public accommodations law to a private entity without even attempting to tie the term "place" to a physical location.' [Citation.] Both the plain meaning of the word, and its meaning considered in historical context, do not support [the plaintiff's] proposed interpretation of 'place of public accommodation.'" (*Cot'n Wash, supra,* 81 Cal.App.5th 1044-1045, fn. omitted.) We agree with this analysis.

11

We are not persuaded by the rationale, articulated in *Carparts, supra,* 37 F.3d 12, 19, that by including "travel service" in the list of places of public accommodation, Congress meant to dispense with the requirement of a physical location. As multiple courts have pointed out, this interpretation ignores the canon of construction *noscitur a sociis*—i.e., a word takes meaning from the company it keeps. (*Almond Alliance of California v. Fish & Game Com.* (2022) 79 Cal.App.5th 337.) Behind the veil of the Latin phrase lies a commonsense concept that if the Legislature meant to radically depart from their overall thrust of including solely physical locations, they would not do so by burying an obscure example in a list, hoping that intrepid judicial explorers would find it someday. They would make it explicit. Congress did not do so, and the reasonable inference from that fact is they did not intend any radical departure from the idea that a "place" is a physical space. Moreover, a travel agency plainly can be, and often is, a physical space open to the public.

Nor are we persuaded by the dissent's reasoning that "place" is defined in Merriam-Webster's Collegiate Dictionary (11th ed. 2003) at page 946 (Merriam-Webster) as, among several other definitions, "an indefinite region or expanse." The dissent interprets that definition as allowing such ethereal places as a Web site to constitute a place, citing modern usages of the term in such a manner. There are at least two flaws in this approach. First, the examples Merriam-Webster's offers for that definition indicate that even this definition refers to physical locations. The examples given in Webster's Third New International Dictionary (2002) at page 1727 include: "visit the far places of the earth," "small supplies of foreign ore . . . brought from places like No. Africa . . . ," and "schools continued to spring up all over the place . . . ." Thus, while "place" can refer to something indefinite—the western United States, for example—even under this definition, it is still referring to a physical space. Every other definition we could find of the word "place," moreover, clearly refers to a physical location. To the extent *modern* usage has evolved to allow the word "place" to refer to a

12

web site, it would be anachronistic to apply such usage to Congress in 1990.  The second flaw in utilizing this definition is that there is simply no reason to think that Congress used the word "place" in this manner.  All the examples Congress gave of public accommodations in section 12181(7) are specific physical structures or locations, which is more consistent with another definition Webster's Third New International Dictionary (2002) at page 1727 offers:  "a building or locality used for a special purpose."

Because we conclude that the ADA applies only to physical places, and because plaintiffs did not allege a violation of the ADA arising from any physical space, they failed to state a claim under the Unruh Act for a violation of the ADA.

*Legislative History and Public Policy Do Not Support Interpreting the ADA to Apply to Stand-alone Web sites*

Even if we were to find that the phrase "place of public accommodation" was ambiguous, and even if we determined to look to public policy and legislative history as an aid to interpretation, we would still conclude that the ADA does not apply to Web sites.  (See *City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 616-617 [""'If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy"'"].)

In addressing the legislative history of the ADA as it applies to Web sites, we begin with a plain truth acknowledged by every court that has addressed this issue: the Internet in its present form did not exist at the time the ADA was passed.  Thus, there literally is no contemporaneous legislative intent regarding the Internet.  The legislators who voted on the ADA likely had no conception of the digital revolution the Internet would introduce.  To the extent we attempt to apply legislative history to this issue, therefore, we necessarily enter a realm of speculation:  Can we infer from more general statements that Congress intended for generic terms like "service establishment" to include something they had little conception of at the time?  The one line of legislative

13

history that courts of the minority view rely on comes from a House committee report, which states, "'[T]he Committee intends that the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times.'" (*Netflix, supra,* 869 F.Supp.2d at p. 201.) While this line is certainly relevant, it is hardly determinative: it is one line buried in a committee report written at a time when the Internet revolution had not yet occurred.

Instead, we conclude this is the rare case where *subsequent* legislative history is of more value in determining how Congress viewed the scope of the ADA. (See *Ailanto Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 589, fn. 13 ["We may properly rely on the legislative history of subsequent enactments to clarify the Legislature's intent regarding an earlier enacted statute. 'Although a legislative expression of the intent of an earlier act is not binding upon the courts in their construction of the prior act, that expression may properly be considered together with other factors in arriving at the true legislative intent existing when the prior act was passed. [Citations.]' [Citation.] While the concept of 'subsequent legislative history' may seem oxymoronic, it is well established that 'the Legislature's expressed views on the prior import of its statutes are entitled to due consideration, and we cannot disregard them'"].)[2]

---

[2]     Subsequent legislative history, of course, has its limits. As our high court explained, "Ordinarily, subsequent legislative history is given little weight in statutory interpretation. [Citation.] Nevertheless, it is 'sometimes considered relevant.'" (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 54, fn. 17.) While at first blush the concept of subsequent legislative history may seem oxymoronic, we frequently infer the meaning of words from subsequent acts. Consider this hypothetical example one might encounter in everyday life: a man approaches you and says, "you rascal." He then winds up and throws a punch. The punch would be good evidence that he meant "rascal" pejoratively. But now imagine he says the same thing, then he cracks a big smile and opens his arms up for a hug. His subsequent acts reflect a more playful meaning to "rascal." Sometimes, subsequent acts are the best indicator of the meaning of earlier words.

14

At the federal level, the history of the Internet is a history laissez-faire treatment. From the infancy of the Internet, Congress has maintained a stated public policy of intentionally avoiding burdening the Internet with laws and regulations. Thus, as early as the Telecommunications Act of 1996 (Pub.L. No. 104-104 (Feb. 8, 1996) 110 Stat. 56), Congress made the following findings: "The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens" (47 U.S.C. § 230(a)(1)), and, "The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation" (47 U.S.C. § 230(a)(4)). It then stated the following public policy: "to preserve the vibrant and competitive free market *that presently exists* for the Internet and other interactive computer services, *unfettered by Federal or State regulation.*" (47 U.S.C. § 230(b)(2), italics added.) Thus, six years after the passage of the ADA, Congress did not seem to view the Internet as being subject to government regulations, such as the ADA. Quite the contrary. Two years later, Congress passed the Internet Tax Freedom Act. (47 U.S.C. § 151 note.) A House of Representatives report described this as a bill "[t]o establish a national policy against State and local interference with interstate commerce on the Internet," stating the bill would establish "a moratorium on the imposition of exactions that would interfere with the free flow of commerce via the Internet . . . ." (H.R. No. 3529, 105th Cong., 2nd Sess. (1998).)

Beginning in the 2000s, Congress was aware of the issue of whether the ADA applies to the Internet, but simply chose not to act. As the *Cot'n Wash* court

Divining the intent of a Legislature, of course, is vastly more complicated, and we approach the subject mindful of a court's limited ability to construct a coherent legislative intent. However, as we explain below, this is the rare case where subsequent history evinces a consistent, unambiguous legislative intent.

15

explained in great detail, "as early as 2000, Congress began holding hearings to discuss the significance, for purposes of interpreting the ADA, of the fact that commerce was increasingly occurring online. . . . [Citation.] It further heard from the [Department of Justice], which was of the opinion 'that the ADA's accessibility requirements do apply to private Internet web sites and services.' [Citation.] The committee recognized that the changing role of Internet commerce 'raise[d] issues related to the new significance of the Internet economy to recent economic growth, the costs that application of the ADA would impose on that rapidly expanding segment of the economy, and the substantial First Amendment implications of applying the ADA to private Internet web sites and services.' [Citation.] These same issues were again discussed at a September 13, 2006 hearing before the same committee." (*Cot'n Wash*, *supra*, 81 Cal.App.5th at p. 1049.)

"Nevertheless, when Congress amended the ADA in 2008," (*Cot'n Wash*, *supra*, 81 Cal.App.5th at p. 1049) "[i]t took no . . . legislative action to clarify 'place of public accommodation.' Thereafter, in 2010, a congressional committee expressly acknowledged the need for clarification in this area in order to realize the goals of the ADA, and called upon the [Department of Justice] to act" (*id*. at p. 1050). "In response, the [Department of Justice] representative at the hearing indicated in no uncertain terms that the [Department of Justice] viewed [Web sites], whether or not associated with a physical place, as places of public accommodation under Title III. [Citation.] The [Department of Justice] has offered the same view in amicus curiae briefs filed in various federal courts for over 20 years. Yet the [Department of Justice] has chosen not to exercise its rulemaking power and issue any regulations on this topic. Instead, it continues to file amicus curiae briefs, and earlier this year issued guidance that—unlike those amicus brief submissions—is ambiguous as to whether a brick and mortar presence is necessary for a [Web site] to constitute a 'place of public accommodation.'" "It thus appears that, no later than 2010, Congress and the [Department of Justice] (1) both recognized the need to clarify whether and under what circumstances a [Web site] might

16

constitute a 'place of public accommodation,' and (2) agreed that such clarification should take a broad and inclusive approach. The only conclusion we can draw from their failure, in the 12 years that followed to provide any such clarification through regulation or statute is that neither officially endorses this approach. We cannot attribute this inaction to Congress's difficulty with or reluctance to draft laws specifically addressing [Web sites], given that the ADA expressly addresses accessibility of *some* [Web sites] for disabled individuals—it just does not do so in the context of Title III. Specifically, federal departments and agencies must provide individuals with disabilities the same level of access to electronic and information technology—including through [Web sites]—as that enjoyed by individuals without disabilities." (*Cot'n Wash, supra,* 81 Cal.App.5th at pp. 1050-1051, fn. omitted.)[3]

The Federal Communications Commission (FCC) took a similar, hands-off approach to regulating the Internet. In a ruling entitled "Restoring Internet Freedom Order," the FCC described the history of regulation of the Internet as follows: "The broader internet ecosystem thrived under the light-touch regulatory treatment of Title I, with massive investment and innovation by both ISPs and edge providers, leading to previously unimagined technological developments and services." (83 Fed.Reg. 7852 (Feb. 22, 2018).) It emphasized that this "light-touch regulatory scheme . . . enabled the internet to develop and thrive for nearly two decades." (*Ibid.*) It noted that this approach "fostered the internet's growth, openness, and freedom." (*Ibid.*) In tracing the history of

---

[3]     Plaintiffs place heavy emphasis on the Department of Justice's position, taken in various amicus briefs and other filings, that the ADA applies to stand-alone Web sites. They have moved for judicial notice of several such filings, which we grant. However, as plaintiff acknowledges, such informal statements from a regulatory body are only "entitled to respect to the extent they have the power to persuade." (*Skillin v. Rady Children's Hospital & Health Center* (2017) 18 Cal.App.5th 35, 45, fn. 4.) Plaintiffs have not pointed to anything in those filings that persuades us the Department of Justice is correct.

17

this approach, the FCC stated, "For decades, the lodestar of the Commission's approach to preserving internet freedom was a light-touch, market-based approach. This approach debuted at the dawn of the commercial internet during the Clinton Administration, when an overwhelming bipartisan consensus made it national policy to preserve a digital free market 'unfettered by Federal or State regulation.' It continued during the Bush Administration, . . . and was then formally adopted by a unanimous Commission in 2005 . . . . And it continued for the first six years of the Obama Administration. We reaffirm and honor this longstanding, bipartisan commitment by adopting a light-touch framework that will preserve internet freedom for all Americans." (83 Fed.Reg. 7891, *supra*.)

Courts have sometimes described as "absurd" the idea that Congress would not want to have imposed the ADA on Web sites. (*Netflix, supra,* 869 F.Supp.2d at p. 200.) In light of the history recounted above, however, we think quite the opposite is true: it is unreasonable to think that Congress would have uncritically imposed the entire edifice of the ADA onto Web sites as though they were no different from physical stores. What we know about congressional intent regarding the Internet is that at the earliest opportunity, across multiple administrations and both political parties, Congress maintained a consistent, publicly stated policy of avoiding passing laws that could interfere with the free, market-based development of the Internet. The relevant regulatory agencies have either eschewed regulating the Internet (the FCC) or have deliberately chosen not to act (the Department of Justice). Thus, to the extent we can divine any Congressional intent at all as it pertains to the ADA and Web sites, the only reasonable conclusion is that Congress did not intend for the ADA to be applied to Web sites. Because plaintiffs alleged an ADA violation arising from their access to a stand-alone Web site, they failed to state a claim.[4]

---

[4]  We express no opinion on whether Web sites with a nexus to a physical place are generally governed by the ADA. However, we note the general trend in both federal and California cases is that such Web sites are governed by the ADA. (See, e.g.,

In reaching this conclusion, we emphasize that our task here is to *interpret* the ADA, not pass judgment on whether applying the ADA to Web sites is desirable. Indeed, the dissent presents a powerful case for the desirability of applying the ADA to Web sites. However, the policy arguments in favor of applying the ADA to Web sites must be counterbalanced against the costs that such rules would impose on businesses and society generally. The weighing of those costs and benefits is not something this court is institutionally equipped to perform, nor is it our constitutional role. Rather, Congress and regulatory bodies are the branches of government best equipped to create such rules. Congress and the Department of Justice can hold hearings where the foremost experts in the field testify and where all interested stakeholders can each make their case. While, in contrast, we hear from two parties who may or may not be representative of all stakeholders and whose attorneys may or may not have expertise in the field. Congress and the Department of Justice, moreover, can approach this subject with nuance, whereas, in this case, we could only paint with a broad brush. Such nuance is critical in this highly technical realm, and devising nuanced rules is not easy. Even the Department of Justice, which agrees in principle that the ADA should apply to Web sites, has struggled to formulate workable rules, as demonstrated by the Department of Justice's recent aborted attempt to create regulations applying the ADA to Web sites. (See dissent at pp. 7-8 [noting that after a several-year attempt, the Department of Justice withdrew its notice of rulemaking to allow for "additional review of data and further analysis" to determine "whether specific technical standards are necessary and appropriate to assist covered entities with complying with the ADA"].) Thus, while we acknowledge the weighty policy arguments the dissent presents, we do not believe it is this court's role to establish and implement those policies.

---

*SDCCU, supra,* 50 Cal.App.5th 1048; *Thurston v. Midvale Corp.* (2019) 39 Cal.App.5th 634.)

19

*Plaintiffs Failed to State a Claim for Intentional Discrimination*

As an alternative to a claim under the ADA, plaintiffs contend they have stated a cause of action under the Unruh Act for intentional discrimination. Plaintiffs' position is Thi E-Commerce exhibited intentional discrimination by failing to correct the barriers to access on its Web site after plaintiffs' counsel sent a letter threatening to sue. We agree with the trial court that plaintiffs' allegations do not amount to intentional discrimination.

"'[A] plaintiff seeking to establish a case under the Unruh Act must plead and prove intentional discrimination in public accommodations in violation of the terms of the Act. A disparate impact analysis or test does not apply to Unruh Act claims.'" (*Koebke v. Bernardo Heights Country Club* (2005) 36 Cal.4th 824, 854 (*Koebke*).) Intentional discrimination requires "'willful, affirmative misconduct on the part of those who violate the Act.'" (*Id.* at p. 853.) "Nonetheless, . . . *evidence* of disparate impact could be admitted in Unruh Civil Rights Act cases because 'such evidence may be probative of intentional discrimination in some cases . . . .'" (*Id*. at p. 854.)

The *Cot'n Wash* court addressed an identical argument to what plaintiffs raise here. In rejecting the argument, the court reasoned, "[I]f, under the reasoning of *Koebke*, [the plaintiff] cannot establish [the defendant's] intent to discriminate by showing only that its [Web site] does not allow visually impaired individuals the same access available to those who are not visually impaired (i.e., a disparate effect of a neutral structure), it follows that [the defendant's] *failure to address* this disparate effect likewise cannot establish [the defendant's] intent to discriminate." (*Cot'n Wash, supra,* 81 Cal.App.5th at p. 1036.) We generally agree with this reasoning, with the caveat that there could be extreme situations where the impact is so significant, and the amelioration so trivial, that intentional discrimination is a legitimate inference from a failure to correct. But those would be exceptional cases, not the rule.

This is not the exceptional case. Here, plaintiffs' attorney's letter to Thi E-Commerce did not even explain what barriers existed for blind people. The notice was about as general as one could imagine, and thus there is no reasonable inference of intentional discrimination from Thi E-Commerce's decision not to ameliorate unspecified access barriers. Moreover, given these barriers concerned a Web site, for the reasons we explained above, there was no reason for Thi E-Commerce to believe that it needed to accommodate plaintiffs under the ADA. Accordingly, the allegations do not state a case of intentional discrimination.

DISPOSITION

The judgment is affirmed. Thi E-Commerce shall recover costs on appeal.

SANCHEZ, ACTING P. J.

I CONCUR:

MOTOIKE, J.

21

**DELANEY, J.**, Concurring in part, dissenting in part.

I agree with the majority's analysis and conclusion regarding plaintiff's intentional discrimination theory of liability. I respectfully disagree as to the viability of plaintiff's allegations which rest on purported violations of the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.; ADA or the Act). I would find plaintiff has stated a claim under the Unruh Civil Rights Act (Civ. Code, § 51 et seq.) based on alleged violations of the ADA, and I would reverse the order sustaining the demurrer on that basis alone.

As with any issue of statutory interpretation, the first place to start is the ordinary meaning of the words used in the statute—here, "place of public accommodation." (42 U.S.C. § 12182(a); *Green v. State of California* (2007) 42 Cal.4th 254, 260 (*Green*).) Because the ADA defines "public accommodation" (42 U.S.C. § 12181(7)), the key is the meaning of the word "place." While that word is often used to describe a physical location (see Merriam-Webster Dict. Online (2023) <https://www.merriam-webster.com/dictionary/place> [as of Sept. 6, 2023] archived at: <https://perma.cc/YZ6M-C7JF> [including "physical environment" among definitions of "place"]), its meaning stretches further.

"'Place' includes . . . 'an indefinite region or expanse.' Merriam-Webster's Collegiate Dictionary, 946 (11th ed. 2003). A website qualifies as an indefinite region or expanse located in the digital realm. Consistent with this understanding, a 'website' has been defined as 'a *place* on the internet where information is available about a particular subject, organization, etc.' Macmillan Dictionary Online (emphasis added). Therefore, a 'place' does not necessitate the presence of a physical environment; a virtual website can also be a 'place' as that term is commonly used and understood." (*United States v. Green* (9th Cir. 2021) 12 F.4th 970, 974, fn. omitted; see also Merriam-Webster Dict. Online (2023) <https://www.merriam-webster.com/dictionary/place> [as of Sept. 6, 2023] archived at: <https://perma.cc/YZ6M-C7JF> [defining "place" to include "an indefinite

1

region or expanse"]; Cambridge Dict. Online (2023) <https://dictionary.cambridge.org/us/dictionary/english/website> [as of Sept. 6, 2023] archived at: <https://perma.cc/L3XU-975D> [defining "website" as "a place on the internet with one or more pages of information about a subject"].)

The majority concludes a "place of public accommodation" unambiguously requires a physical location because (1) "it is the most natural usage of the phrase"; (2) the statutory examples of public accommodations "are all places that traditionally operate out of a physical location open to the public"; and (3) ADA enforcing regulations provide a definition which includes the word facility, which, in turn, is defined in terms of physical structures. Each of these bases limits the common meaning of the word "place" in a manner inconsistent with statutory interpretation principles and the purpose of the Act.

First, the focus of the initial step of statutory interpretation is whether the plain meaning of the words is unambiguous. (See *Green, supra*, 42 Cal.4th at p. 260.) This necessarily involves consideration of all reasonable meanings. (*Moran v. Murtaugh Miller Meyer & Nelson, LLP* (2007) 40 Cal.4th 780, 783.) That one reasonable meaning may be more "natural" or more commonly used does not render a statute unambiguous. (See *People v. Leal* (2004) 33 Cal.4th 999, 1007 [statutory language is unambiguous if not reasonably susceptible to more than one meaning].)

Second, the public accommodation examples provided in 42 U.S.C. section 12181(7) do not provide any unambiguous physical limitation. As the First Circuit Court of Appeals recognized, around the time the ADA was enacted, at least some of the types of businesses listed operated with customers on occasion exclusively by telephone or

written correspondence.[1] (*Carparts Distribution Center v. Automotive Wholesaler's Assn.* (1st Cir. 1994) 37 F.3d 12, 19 (*Carparts*).) Even assuming most of the listed businesses traditionally operated at brick-and-mortar locations, there is no express language showing an intent to so limit the Act's application. Businesses like bakeries, grocery stores, clothing stores, libraries and galleries, for example, are all types of businesses capable of operating without a publicly accessible physical location. Thus, their inclusion in the statute, at minimum, leaves room to reasonably infer Congress did not intend a physical limitation. This is underscored by the open-ended language at the end of each enumerated category (e.g., "or other sales or rental establishment", "or other place of public display or collection", "or other place of education"). (42 U.S.C. § 12181(7).) While Congress chose to limit the categories of private entities to which the ADA would apply, it expressly allowed for its application to types of entities not specifically listed so long as they fall within the scope of one of the enumerated categories. (See H.R.Rep. No. 101–485(III), 2nd Sess., p. 54 (1990), reprinted in 1990 U.S. Code Cong. & Admin. News, p. 477; Sen.Rep. No. 101–116, 1st Sess., p. 54 (1989).)

Third, regulations are not a definitive indicator of Congressional intent. It is not unheard of for regulations, which are developed by executive branch agencies, to

---

[1] The majority expresses its disagreement with the First Circuit's analysis on this point, saying it "ignores the cannon of construction *noscitur a sociis*." However, application of that principle in this case is problematic. As detailed below, a construction of the ADA which limits its application to public accommodations with a physical location severely frustrates the Legislature's clear intent. Under such circumstances, our obligation to effectuate the Legislature's intent overrides the *noscitur a sociis* doctrine. (See *Moore v. California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1011–1012 [any maxim of jurisprudence, including *ejusdem generis* and *noscitur a sociis*, must yield to legislative intent if application of maxim would frustrate intent underlying statute]; *Irwin v. City of Manhattan Beach* (1966) 65 Cal.2d 13, 21 ["quest after legislative purpose remains paramount" to all maxims of jurisprudence which operate as interpretive aids]; *Almond Alliance of California v. Fish & Game Com.* (2022) 79 Cal.App.5th 337, 354 ["Statutory interpretation cannons . . . must heed to legislative intent"].)

3

misinterpret or run counter to statutory language and Congressional intent. (See *Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 205 ["[N]o regulation is valid if its issuance exceeds the scope of the enabling statute"]; see also *Chevron U.S.A. Inc. v. Natural Res. Def. Council* (1984) 467 U.S. 837, 843, fn. 9 ["The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent"]; *FEC v. Democratic Senatorial Campaign Comm.* (1981) 454 U.S. 27, 31–32 [court must reject administrative constructions of statute which are inconsistent with statutory mandate or frustrate policy Congress sought to implement].) Thus, at best, regulations are one of the many tools to be employed when statutory language is ambiguous. (*City of Long Beach v. Department of Industrial Relations* (2004) 34 Cal.4th 942, 951 [regulations are "one of several interpretive tools that may be helpful", but court has ultimate responsibility to construe statute].)

With more than one reasonable meaning of the word "place", this court must look beyond the statutory language to determine Congress's intent. (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 340.) We turn to extrinsic aids such as "the statutory scheme of which the provision is a part, the history and background of the statute, the apparent purpose, and any considerations of constitutionality, 'in an attempt to ascertain the most reasonable interpretation of the measure.'" (*Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 776.) "Ultimately[,] we choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to promoting rather than defeating the general purpose of the statute." (*Allen v. Sully-Miller Contracting Co.* (2002) 28 Cal.4th 222, 227 (*Allen*).) Applying these principles here, all roads lead to one conclusion.

The ADA was a momentous culmination of a bipartisan effort to "assure equality of opportunity, full participation, independent living, and economic self-sufficiency for . . . individuals [with disabilities]." (42 U.S.C. § 12101, (a)(7); see also *National Federation of the Blind v. Scribd Inc.* (D.Vt. 2015) 97 F.Supp.3d 565, 575

4

(*Scribd*) [referring to ADA as "the most sweeping civil rights legislation since the Civil Rights Act of 1964"].) The U.S. Supreme Court has detailed the landmark legislation's purpose: "Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals. In studying the need for such legislation, Congress found that 'historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.' [Citations.] Congress noted that the many forms such discrimination takes include 'outright intentional exclusion' as well as the 'failure to make modifications to existing facilities and practices.' [Citation.] After thoroughly investigating the problem, Congress concluded that there was a 'compelling need' for a 'clear and comprehensive national mandate' to eliminate discrimination against disabled individuals, and to integrate them 'into the economic and social mainstream of American life.'" (*PGA Tour, Inc. v. Martin* (2001) 532 U.S. 661, 674–675 (*PGA Tour*).)

The legislation embodies that broad mandate. "[O]ne of the Act's 'most impressive strengths' has been identified as its 'comprehensive character,' [citation], and accordingly the Act has been described as 'a milestone on the path to a more decent, tolerant, progressive society' [citation]." (*PGA Tour, supra*, 532 U.S. at p. 675.)

This clear, sweeping, comprehensive purpose and intent is furthered by an interpretation which does not limit the ADA's application to brick-and-mortar public accommodations. In contrast, it would be defeated by an interpretation that persons wishing to access goods and services of a public accommodation with a physical location open to the public are protected by the ADA while those attempting to access identical goods and services from an identical public accommodation lacking a physical location open to the public are not. The earliest federal court of appeals to consider the physical presence issue came to this very conclusion in a decision rendered just a few years after the ADA was enacted. (*Carparts, supra*, 37 F.3d at p. 19.)

5

Applying the ADA only to public accommodations with a physical location is effectively a determination Congress intended to freeze the legislation in time, applying it only to life as it existed when it was enacted. Such an interpretation is problematic. Not only does it unwarrantedly curtail the envisioned integration of people with disabilities into all aspects of everyday life (see Sen.Rep. No. 101–116, *supra*, at p. 10 [ADA purpose is to "bring Americans with disabilities into the mainstream of society[,]" 'in other words, full participation in and access to all aspects of society'"]), but it also runs contrary to legislative history evidencing Congress's intent for the ADA to keep pace with changing times.

In discussing the requirement for public accommodations to provide auxiliary aids and services unless doing so would pose an undue burden, Congress made clear technological advances would impact a public accommodation's responsibilities. Although "auxiliary aids and services" is defined in the legislation, the definition was intended to provide examples only. (42 U.S.C. § 12103(1); Sen.Rep. No. 101-116, *supra*, at p. 58.) To the extent technological advances, for example, rendered affordable or readily available an auxiliary aid or service previously unaffordable or unavailable, Congress explained the change would require covered entities to provide it. (Sen.Rep. No. 101–116, *supra*, at p. 59; see also H.R.Rep. No. 101–485(II), 2nd Sess., p. 108 (1990), reprinted in 1990 U.S. Code Cong. & Admin. News 303, p. 391 ["[T]he types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times"].)

To conclude Congress intended the legislation to evolve with technological and other advancements regarding the provision of aids and services by public accommodations, but not with the same types of advancements regarding public accommodations themselves, would be unsound. Indeed, the whole of the legislation was intended to be "future driven[.]" (H.R.Rep. No. 101–485(II), *supra*, at p. 122; Sen.Rep. No. 101–116, *supra*, at p. 67.) We simply cannot condone an absurd result under the

6

guise of statutory interpretation. (*Allen, supra*, 28 Cal.4th at p. 227 ["Any [statutory] interpretation that would lead to absurd consequences is to be avoided"].)

The majority dismisses the legislative history surrounding adoption of the Act, calling any application of it speculative given the non-existence of the Internet in its present form at the time of the ADA's passage, and it does not give due consideration to the legislation's purpose. Instead, it focuses on the actions and inaction of Congress and federal agencies, including the Federal Communications Commission (FCC) and the Department of Justice (DOJ), during the more than 30 years since the ADA took effect.

These postenactment occurrences, many of which concern the Internet generally and not the ADA itself, and many of which took place a decade or more later, have limited, if any, value. As the Supreme Court has cautioned, "'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'" (*Reno v. Bossier Parish School Bd.* (1997) 520 U.S. 471, 484–485; see also *Consumer Product Safety Comm'n. v. GTE Sylvania* (1980) 447 U.S. 102, 118, fn. 13 ["[S]ubsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment"].) Relying on the views of subsequent congressional committee members is similarly of trifling value. (Regional Rail Reorganization Act Cases (1974) 419 U.S. 102, 132 [statement of legislator made after passage of legislation represents only personal view].)

Separate from its weight, the substance of the subsequent history sheds little light on the crux of the matter before us. The identified statements from Congress and the FCC concerning the Internet, generally, convey an intent to limit regulation of the Internet to foster innovation and a naturally competitive free market. While limiting, inter alia, taxation and restriction of information flow or content may align with such intent, it is difficult to conceive how prohibiting disability discrimination (by applying the ADA to Web sites) would work to the contrary. Indeed, applying the ADA to Web

7

sites would further expansion of the market through additional consumers who have thus far been effectively excluded from this ever expanding aspect of the "'economic and social mainstream of American life.'" (*PGA Tour, supra*, 532 U.S. at p. 675.)

Regarding the DOJ's lack of official regulations for public accommodation Web sites, the DOJ has spoken. Consistent with its longstanding position the ADA does not have a physical space restriction (see *Scribd, supra*, 97 F.Supp.3d at p. 574 [providing examples of DOJ's expressed position]), it released a notice of public rulemaking indicating its intent to adopt regulations concerning accessibility of public accommodations' Web sites and soliciting input on a variety of related issues. (75 Fed.Reg. 43460–43467 (July 26, 2010).) In the notice, the DOJ recognized "the need to move forward deliberatively" so as to delicately balance the provision of "specific guidance to help ensure Web access for individuals with disabilities without hampering innovation and technological advancement on the Web." (*Id*. at 43464.) Years later, in withdrawing the rulemaking notice, the DOJ said it was doing so to allow for "additional review of data and further analysis" to determine "whether specific technical standards are necessary and appropriate to assist covered entities with complying with the ADA." (82 Fed.Reg. 60932 (Dec. 26, 2017).) Separately, "[t]he lack of specific regulations does not eliminate [an entity's] obligation to comply with the ADA or excuse its failure to comply with the mandates of the ADA." (*Gorecki v. Hobby Lobby Stores, Inc.* (C.D.Cal., June 15, 2017, No. CV 17-1131-JFW(SKX)), 2017 U.S. Dist. LEXIS 109123; see also *Access Now, Inc. v. Blue Apron, LLC* (D.N.H, Nov. 8, 2017, No. 17–cv–116–JL), 2017 U.S. Dist. LEXIS 1185112 [notwithstanding absence of regulations, ADA's general mandate remains enforceable].)

As for Congress's failure to provide legislative clarification in the last decade or so since a clear judicial division arose, "[l]egislative silence is a poor beacon to follow" in construing a statute. (*Zuber v. Allen* (1969) 396 U.S. 168, 185; see also *id.* at p. 186, fn. 21 ["'It is at best treacherous to find in congressional silence alone the

8

adoption of a controlling rule of law'"]; *Brecht v. Abrahamson* (1993) 507 U.S. 619, 632 ["As a general matter, we are 'reluctant to draw inferences from Congress'[s] failure to act'"]; *United States v. Riverside Bayview Homes, Inc.* (1985) 474 U.S. 121, 137 ["[W]e are chary of attributing significance to Congress'[s] failure to act . . . "]; *White v. Henman* (7th Cir. 1992) 977 F.2d 292, 294 [concluding congressional inaction in 1970s "cannot alter the meaning of a statute enacted in 1946"].) Further, the inaction may have various meanings. (See *Scribd, supra*, 97 F.Supp.3d at p. 575 ["There are many reasons why Congress may not have acted to amend the ADA"].) It could mean Congress believes the ADA was never meant to apply to public accommodations lacking a brick-and-mortar presence; it could mean Congress believes, consistent with the DOJ's interpretation of the Act, the existing statutory language covers all Web sites, including stand-alone ones; or, it is equally plausible Congress has not acted to clarify one way or the other because the political climate is such that there is not a sufficient consensus to do so. (See *Zuber, supra*, 396 U.S. at pp. 185–186, fn. 21 ["Congressional inaction frequently betokens unawareness, preoccupation, or paralysis"].)

As the Supreme Court recognized more than five years ago, "[t]he Internet's prevalence and power have changed the dynamics of the national economy." (*South Dakota v. Wayfair, Inc.* (2018) 585 U.S. __ [138 S.Ct. 2080, 2097].) "In 1992, less than 2 percent of Americans had Internet access" and "mail-order sales in the United States totaled $180 billion." (*Ibid.*) By 2018, about 89 percent of Americans had Internet access and electronic commerce (e-commerce) retail sales alone in the prior year were estimated to be $453.5 billion. (*Ibid.*) As of 2021, e-commerce retail sales were estimated to be almost $959 billion. (Dept. of Commerce, U.S. Census Bureau, Estimated Annual U.S. Retail Trade Sales – Total and E-commerce: 1998-2021 (Dec. 15, 2022), https://www2.census.gov/programs-surveys/arts/tables/2021/ecommerce.xlsx [as of Sept. 6, 2023] archived at: <https://perma.cc/ZAT7-4DD5>.) Of that amount, approximately $545 billion came from retailers without a physical store presence. (Dept.

9

of Commerce, U.S. Census Bureau, Estimated Annual U.S. Retail Trade Sales – Total and E-commerce: 1998-2021 (Dec. 15, 2022), https://www2.census.gov/programs-surveys/arts/tables/2021/supecommerce4541.xlsx [as of Sept. 6, 2023] archived at: <https://perma.cc/8QL4-ZTVJ>.)  Simply put, "internet commerce is now ubiquitous." (*Sellers v. JustAnswer LLC* (2021) 73 Cal.App.5th 444, 464 (*Sellers*).)

E-commerce is not the only way in which the Internet and other factors have revolutionized everyday life.  "Now more than ever, the Internet provides 'one of the central means of information-gathering and communication in our culture.'" (*United States v. Egli* (10th Cir. 2021) 13 F.4th 1139, 1147.)  "[T]he Internet . . . is now practically unavoidable in daily life." (*People v. Salvador* (2022) 83 Cal.App.5th 57, 67.) Of most notable recent import, during the COVID-19 pandemic many brick-and-mortar businesses closed and transitioned to providing goods and services via the Internet.  (See *Sellers, supra*, 73 Cal.App.5th at p. 464.)  While some physical locations ultimately reopened, others remain as online only offerings.  Adding to those reconfigured offerings is an ever-growing presence of new exclusively Internet-based goods and services in industries such as education, health, professional services, transportation, travel services, and entertainment.

There can be no denying that in today's world, "[t]he Internet is central to every aspect of the 'economic and social mainstream of American life.'" (*Scribd, supra*, 97 F.Supp.3d at p. 575.)  "'Despite Congress'[s] great cognitive powers, it could not have foreseen these advances in technology which are now an integral part of our daily lives. Yet Congress understood that the world around us would change and believed that the nondiscrimination mandate contained in the ADA should be broad and flexible enough to keep pace.'" (*Ibid.*)

To be clear, this decision is not about desirability, policy preferences, balancing of costs and benefits, or the technological implications of applying the ADA to stand-alone Web sites.  That is not our role.  Indeed, I join with the majority in

10

emphasizing "that our task here is [solely] to interpret the ADA, not pass judgment on whether applying the ADA to Web sites is desirable." But Congress has spoken, and use of the statutory interpretation tools leads in only one direction. Interpreting the ADA to have no physical location restriction, applying it to any qualifying public accommodation irrespective of its chosen method to transact with customers and clients, is the only offered interpretation of the legislation that both promotes and effectuates the law's purpose (*Allen, supra,* 28 Cal.4th at p. 227; *Brown v. Montage at Mission Hills, Inc.* (2021) 68 Cal.App.5th 124, 129), and avoids ""severely frustrat[ing] Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges, and advantages available indiscriminately to other members of the general public"" (*Scribd, supra*, 97 F.Supp.3d at p. 576).



DELANEY, J.

11